Robert B. REICH, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

WALDBAUM, INC., Defendant.

No. 89 Civ. 3414 (CHT).

United States District Court, S.D. New York.

Sept. 30, 1993.

U.S. Dept. of Labor by Douglas Weiner and Percy S. Miller, New York City (Judith E. Kramer, Sol. of Labor, Patricia Rodenhausen, Regional Sol., of counsel), for plaintiff.

Catalano & Sparber, New York City (Douglas P. Catalano, Neil G. Sparber, Steven H. Blatt, of counsel), for defendant.

## ORDER AND OPINION

TENNEY, District Judge.

The Secretary of Labor ("the Secretary") brings this action against Waldbaum, Inc. ("Waldbaum"), alleging willful violations of the recordkeeping and overtime provisions of the Fair Labor Standards Act of 1938 ("FLSA" or the "Act"), as amended, 29 U.S.C. § 201 *et seq.* These violations are alleged to have taken place between May 1986 and October 1989 at 20 stores owned by Waldbaum. The Secretary brings suit under 29 U.S.C. §§ 216(c) and 217, seeking back wages for 262 employees and injunctive relief. Beginning on October 18, 1992, a nine day bench trial was held before this court. For the reasons stated below, Waldbaum is found to have violated the Act, although the violations are not found to be willful. Accordingly, an injunction will be issued. The court also awards back wages, in amounts to be determined by recalculations in accordance with this opinion. Liquidated damages are awarded up to the full amount of the wages withheld.

## BACKGROUND

Waldbaum operates a chain of grocery stores within New York State and is engaged in commerce within the meaning of § 3(s)(2) of the FLSA. Joint Final Pre–Trial Order, Stipulated Fact ("JFPTO Stip. F.") ¶ 2. The twenty stores that are the loci for the alleged violations are in Bronx, Westchester, Putnam, and Rockland counties. From May 15, 1986 until the time of trial, employees at the stores, with the exception of the store managers or co-managers, were paid in accordance with a collective bargaining agreement (the "Agreement") between Waldbaum and Local 338, Retail, Wholesale and Chain Store Food Employees, and in accordance with Waldbaum's compensation policies. *Id.* at ¶ 4.

Each week, Waldbaum's store managers or their designees prepared forms called weekly payroll records. The payroll records contain the name of each employee at the subject store for the payroll week and the number of regular, overtime, and Sunday hours[1] for which the employee should be compensated. These calculations were based upon time card entries submitted by the employees. The payroll records were then submitted to Waldbaum's main office in Central Islip, New York. *Id.* at ¶¶ 7–8. The information from the payroll records were keypunched by data processing or payroll office personnel into the defendant's computer, and a paycheck was generated. *Id.* at ¶ 9. Defendant claims that employees were given an opportunity to notify Waldbaum of any discrepancy between the time cards and the payroll records as reflected in the paychecks.

Plaintiff has conducted eight investigations of Waldbaum since 1962 for violations of the FLSA. Tr. 994, 1163–64. One of those investigations began in 1985 by the Manhattan office of the Labor Department and covered stores in Brooklyn, Queens, and Long Island. Richard Mormile, an investigator for the plaintiff, testified without contradiction that the Secretary's findings of violations of §§ 7 and 11 of the Act in those stores were presented three times to representatives of Waldbaum's "higher management." Tr. 1166. Because Waldbaum did not comply with requests made by the Secretary regarding those investigations, plaintiff brought suit for violations in those stores in the Eastern District of New York, where that action is still pending as *Reich v. Waldbaum, Inc.,* 86 Civ. 0861.

Plaintiff's investigator Patricia Silberman testified that in 1987 she began an investiga-

---

1. The FLSA requires that employees who work more than 40 hours in a work week be compensated at time and a half for each additional hour worked. 29 U.S.C. § 207(a)(1). The hours constituting the base 40 hour period can exceed eight per day, or include weekends and holidays. 29 C.F.R. § 778.102. In some, if not all cases, Waldbaum pays double time for Sunday work.

tion of the subject stores in this action upon review of a complaint by employee Philip Naron. Tr. 992–93. Her review of the Secretary's records indicated that the previous investigations had found violations that plaintiff claims had been brought to the attention of Waldbaum management. Tr. 994; *see* Tr. 1164 (case file reflected that president Ira Waldbaum was informed of results of 1962 investigation). Silberman then went to the stores in question and conducted interviews with employees, which she memorialized in writing. She also mailed questionnaires to other employees and had other investigators conduct similar interviews. Tr. 994–1016. The Secretary compiled additional statements from individuals who appear to be former employees. Tr. 1016–18. From this investigation, the Secretary concluded that violations had occurred and brought suit.

### DISCUSSION

### I. VIOLATIONS OF THE ACT

Section 7 of the FLSA provides that:

No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular [hourly] rate at which he is employed.

29 U.S.C. § 207(1). Compliance with § 7 is safeguarded in part by § 11(c) which requires subject employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him. . . ." 29 U.S.C. § 211(c). The statutory mechanism is completed by 29 U.S.C. §§ 215(a)(2) and (a)(5), which makes unlawful violations of §§ 207(1) and 211(c), respectively.

Among the requirements imposed by the Secretary's implementing regulations are that employees keep and preserve for three years records of (1) the total daily and week-ly hours employees work; (2) employees' regular hourly rates of pay for each week that overtime is worked; (3) total daily or weekly earnings; (4) total wages paid; and (5) total weekly premium pay for overtime hours. 29 C.F.R. §§ 516.2 and 516.5; *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860, 867–68 (S.D.N.Y.1984).

The recordkeeping requirements of the Act are fundamental to the Act's effectiveness. "Failure to keep accurate records can obscure a multitude of minimum wage and overtime violations." *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966). In challenges to the wages paid as reflected in the employer's records,

[d]ue regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours, and other conditions of employment and who is in the position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do the records may be and frequently are untrustworthy.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). Thus, where the records kept are inaccurate, the plaintiff meets his burden if he shows work was performed for which the employees were improperly compensated and if sufficient evidence is produced to establish "the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [plaintiff's] evidence." *Id.* at 687–88, 66 S.Ct. at 1192–93.

■ Plaintiff has provided sufficient evidence to sustain the burden that work was performed for which Waldbaum's employees were not compensated. Plaintiff called thirty-seven employee witnesses at trial. The vast majority of them testified that they had worked hours for which they were not paid. *See*, for example, Tr. 13 (Schuler); Tr. 78 (DiFabio); Tr. 153 (Phillips); Tr. 169 (Mirra); Tr. 297 (Voll); Tr. 487 (Skakel); Tr.

577–78 (Feeney); Tr. 659 (Zappolo). Many indicated that they worked more hours than were reflected on the Waldbaum payroll. Tr. 237 (Scheck); Tr. 276 (McAuley); Tr. 719 (Cedeno); Tr. 820–21 (Grazziano). They also testified that their overtime hours in particular were not accurately compensated. Tr. 404 (Thompson); Tr. 863 (Margerum); Tr. 378 (Borrellie).

Defendant argues that whatever deficiencies existed in payment were the result of the employees' failure to conform to the recording methods of Waldbaum. Defendant claims to base its payments on the time-cards of a punch clock system. It contends that the affected employees were required to punch in upon arriving at work, punch out at the beginning of lunch and break periods, punch in again at the conclusion of the breaks, and to punch out at the end of work-shifts. Instructions regarding this policy were disseminated orally and in writing by the supervisors of the subject employees. Waldbaum also posted signs near the clocks informing the workers of the necessity of punching in and out. (Def.Exh. CA–CK).

Many of the employees testified that they knew of the policy. However, some indicated that they were not diligent in the time they punched, in part because the hours punched seemed to have no effect on the amount they were paid. Pl.Exh. 8 at 18 (Dunlavey Deposition); Tr. 357 (Scherer); see Tr. 590 (Feeney) (assistant managers and grocery manager rarely punched); Tr. 903 (Fanzo) (time spent after punching out was extra time for which he knew he would not get compensated). Others indicated that they would sometimes fail to punch altogether. Tr. 821 (Graziano); Tr. 438 (Lombardi); see Tr. 706 (Martino) (Fleetwood clock was broken, but employees were not paid full amounts for time worked as handwritten on cards). Deposition and witness testimony suggested that on several occasions, the employees were instructed to punch out at the end of a shift and return to work. Tr. 277 (McAuley);

Pl.Exh. 18 at 19 (Leto Dep.); Pl.Exh. 31 (Turner Dep.); see Tr. 438 (Lombardi). Some indicated that despite accurate punching, they were not compensated for the time worked. Pl.Exh. 13 at 9 (Hagopian Dep.); Tr. 305 (Voll); Tr. 524 (Kallman); Tr. 738 (Warth); Tr. 807 (Schaentzler). Others indicated that they were paid according to a schedule apparently fixed by the Agreement, regardless of the hours worked. Tr. 534 (Ryan); Tr. 893–94 (A. Stokes); Tr. 630 (M. Leon); see Tr. 835–36 (McKeon) (did not punch, but was always paid for 40 hours and 8 hours of overtime); Pl.Exh. 17 at 37–38 (Lee Dep.); Pl.Exh. 33 at 11 (Williams Dep.); Pl.Exh. 20 at 13, 20–21. (Mellor Dep.). Still others indicated that they never saw signs in their respective stores, or that the signs were put up after the period relevant to the allegations. Tr. 929–30 (Mullervy) (no notices until 1990). Finally, plaintiff suggests that no individual was ever punished or disciplined for failing to accurately punch his or her card. Tr. 821 (Graziano); Tr. 590 (Feeney); see Tr. 894–95 (Stokes) (sometimes did not punch card because no one cared what was on them as long as there were four punches per day). Indeed, several witnesses indicated that they were chastised for accurately punching their card when the result was that they should be paid more than the man-hours that had been allotted for that store or that shift. See Tr. 276–77 (McAuley).[2]

Also persuasive to the court was testimony concerning coercion, whether real or perceived, of the necessity of putting in additional time in order to keep one's job or to prevent being "broken" to a lower position. See Ex. 13 at 14–16 (Hagopian); Ex. 14 at 28 (Hendrickson); Ex. 16 at 18 (Lammon); Ex. 18 at 46 (Leto); Ex. 26 at 13 (Rampert). The Secretary has emphasized the phrase "You have to do what you have to do to get the job done" as an exemplar of the Waldbaum ethos. See Ex. 25 at 23 (Plambeck). A large number of those who testified recognized the phrase, or a similar sentiment.

2. There was an abundance of testimony as well that the employees made the Waldbaum store managers, district managers, and executives aware of the fact that they were working extra hours for which they were not being compensated. Tr. 512–13 (Kallman); Tr. 410–11 (Thomp-

son); Tr. 198–99 (Zimmerman); Tr. 602 (Feeney); Pl.Exh. 9 at 10–11 (Ettere Dep.) (manager saw employee working on day off); Pl.Exh. 14 at 13 (Hendrickson Dep.) (manager saw employee working extra hours).

They testified that it meant that they would have to work, with or without pay, to complete the task at hand. Such an understanding would invariably lead to inaccurate records, particularly in the face of the overwhelming testimony that defendants knew of the extra hours that were not being compensated.

What is more damaging to defendant's contentions regarding the method of recordation are the actual hours paid. In relation to the issue of damages, discussed below, defendant repeatedly argues that conditions varied from week to week depending on the weather, the time of year, the volume of shipments, and other conditions. Testimony of the employees verified this contention. Tr. 512 (Kallman); Tr. 550 (Grant); Tr. 890 (Stokes); Tr. 813 (Schaentler). Yet the number of hours for which these employees were paid remained remarkably constant. For example, Waldbaum in its brief in a section attacking representative testimony as a means of determining damages quotes approvingly from the trial testimony of Daniel Borrelie who testified that the hours worked varied from store to store and from week to week. Def. Post–Tr.Mem. 79 (citing Tr. 389, 420–22). Yet for all of the weeks listed for Borrellie in March, April, August, and September of 1989, Borellie was paid for exactly forty hours of work and, except for slight deviations on two occasions, eight hours of double time compensation. Pl.Exh. 35 at 22. Similarly, P. Krauss is listed as having been paid for 49.5 hours for all but two weeks between February 2, 1987 and January 2, 1988, during which time he was only paid double time on four occasions totalling fourteen hours. Id. at 126–27. R. Robinson, a dairy assistant, is listed as having only been paid for forty hours per week for a period covering over a year and a half. Id. at 250. These are not isolated incidents. See id. at 108 (Hendrickson), 120–21 (Kallman), 123 (Kelly), 134 (Leon), 208 (Palbon), 247 (Rich).[3]

■ On the basis of these records, as well as the testimony of the witnesses, the court does not doubt that the employees worked hours for which they were not compensated. The court also finds that the testimony, when taken as a whole, raises a just and reasonable inference as to the time that the employees worked. There were moments of hyperbole; one employee testified initially that he worked "24 hours around the clock" on holiday work weeks, before refining that calculation to 12 hours per day during such periods. Tr. 301 (Voll). Another claimed to have worked between 12 and 14 hours a day, seven days a week. Tr. 737 (Warth). But for the most part, the employees' testimony as to the average time worked per week fell within a range of 44 to 64 hours per week. See, Tr. 254 (Scheck) (52 hours a week some weeks, in the range of 45 to 55 hours for a frozen food manager). The court finds the testimony of the employees to be credible, particularly given the consistency of the complaints of the reasons for and the conditions that caused the overtime.[4]

3. The court notes that some of the seeming consistency in the Exhibit is due to the inclusion of only those weeks for which the Secretary claims a certain employee was underpaid. For some employees listed, two adjacent entries shows the same hours paid for the week in question, yet the entries represent weeks that are a month or more apart. See Pl.Exh. 35 at 109 (Hendrickson). Still, for many of the employees, the number of weeks that the hours paid reflects a consistency that casts doubts on Waldbaum's contention of keeping accurate records of jobs, which they admit themselves, requires different weekly overtime hours. Furthermore, a review of Exhibit 34, which is a summary of Waldbaum's payroll records for all of the weeks at issue, reveals the same trend for a number of employees. See Pl.Exh. 34 at 235 (Petrelli); id. at 249 (Platania); id. at 287 (Scheck).

4. The court also finds that the scheme for overtime payment did not allow for flexibility in scheduling hours, despite the indeterminacy of the hours that might be needed. Each store appears to have been given a total number of work hours per week. Members of Waldbaum's higher management testified that if extra hours were needed, for whatever reason, approval was necessary from the district manager. Tr. 1210 (Luchetti); Tr. 1293 (Santiago); Tr. 1330–35 (Sisia). These occurrences were relatively rare. Mr. Sisia, a store manager at the relevant time, stated that he would only call the district manager between six and eight times a year for extra hours. Tr. 1332. No record of this request was kept. Id. The apparent rarity of such requests belies Waldbaum's own contention about the vagaries of hours worked given variable conditions. Additionally, Mr. Santiago, a co-manager, testified, "I would call the DM and tell him ... so

Defendant attacks the trial testimony as unreliable on a number of points, none of which the court finds persuasive. First, Waldbaum attacks the motives of some employees who testified. For example, with regard to Gary Schuler, a grocery manager and assistant manager, Waldbaum argues that he knew that he stood to benefit from the outcome of the case. Tr. 27. Yet as Mr. Schuler testified, he did not know how much he was owed. It would be illogical to discount the testimony of any employee simply because he or she knew of a possible benefit. Also, Waldbaum did not elicit any statements on cross-examination to persuade the court of any bias on the witness's part. Waldbaum also asserts that the fact that Mr. Schuler was twice reduced in rank demonstrates a "motive for biased and exaggerated testimony." Def.Post–Tr.Mem. at 43. If such a motive existed, Waldbaum certainly did not demonstrate it. Defendant makes a similar argument for Gerald McKeon, noting that his displeasure with his employment at Waldbaum was clear from his testimony. *Id.* at 56. While Mr. McKeon may certainly be displeased, particularly if he worked for hours for which he was not paid, his displeasure did not weigh adversely against the veracity of his testimony.

Defendant also asserts that many of the Waldbaum employees who testified were paid properly during certain weeks. *See* Tr. 324 (Merrill); Tr. 852 (Churchill); Tr. 930 (Mullervy). The issue in this case, however, are those weeks that the subject employees were improperly paid. Similarly, defendant argues that certain workers could not confirm that they worked a given number of hours every week. Def.Post–Tr.Mem. at 44. But

such a requirement is contrary to the precedent in *Mt. Clemens Pottery* and the recognition of the Court therein that employees rarely keep such records. *See* 328 U.S. at 687, 66 S.Ct. at 1192. Defendant must remember that workers were asked about an average for a two to three year period that began more than six years prior to the trial. If the memories of the employees are dim, and the recollection of their hours worked merely reasonable estimates, the employer cannot complain about a lack of specificity, when the employer had the initial burden of keeping accurate records.

██ The overwhelming objection that Waldbaum makes as to the employee witnesses concerns the Secretary's claims on their behalf. Def.Post–Tr.Mem. at 43–57. For example, Waldbaum objected to the testimony of Donald McClam, who testified:

> ... that he worked in store 14 approximately fifty-one to fifty-four hours per week (Tr. 393). However, the Government has a claim on behalf of Mr. McClam in which it alleges that he worked an average of fifty-six hours per week. (Pl.Supp.Exh. 35, p. 171).

Def.Post–Tr.Mem. at 49. That the Secretary has failed to accurately incorporate Mr. McClam's testimony into its recalculations does not lead the court to draw negative inferences about the testimony offered. Nor does the fact that the government's calculations for certain employees have fluctuated dramatically over the course of this litigation bear on witness credibility. The grievance goes to the extent of damages, discussed below, but not to liability.[5] Furthermore,

and so, and they would give me the approval for the overtime or, if not, I would work something out with the person and give them time off." Tr. 1293. Thus, after the hours were worked, and permission from the district manager was denied, then some kind of compensation was "worked out." Clearly, such a practice is in violation of the FLSA. At a minimum, it raises a presumption that complete compensation was not always awarded even under circumstances that warranted a store manager contacting a district manager for additional hours.

5. Waldbaum raises a second issue, closer to a question of damages than of liability. Throughout the trial, Waldbaum's counsel asked witness-

es about compensatory time off, i.e., time off from scheduled hours to compensate for extra time worked. Whether compensatory time would be recognized as a form of compensation contemplated by the FLSA for the Waldbaum employees is questionable. *See* 29 C.F.R. § 531.-27(a) (The Act generally requires payment of wages including overtime in cash or negotiable instruments payable at par value). The only mention in the FLSA of compensatory time applies to "[e]mployees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency...." 29 U.S.C. § 207(*o*). Because the "Act takes a single workweek as its standard," 29 C.F.R. § 778.104, there is a reasonable argument that compensatory time

defendant's argument with the calculation methodology cannot undermine the testimony offered at trial, unless the defendant introduces to the contrary specific evidence of the hours actually worked or evidence that undermines the reasonableness of the estimate. *See Mt. Clemens Pottery*, 328 U.S. at 687–88, 66 S.Ct. at 1192–93.[6]

## II. WILLFULNESS

 Congress amended the Portal–to–Portal Act ("Portal Act") to create a two year statute of limitations on an action accruing as a result of an FLSA action, except that the period may be extended to three years if the violation was "willful." 29 U.S.C. § 255(a). If the violation is willful, the Secretary may recover back damages accruing in the additional year. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1061 (2d Cir.1988). The Supreme Court has concluded that conduct is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute...." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). Willfulness, under this standard, cannot be found on the basis of mere negligence or "on a completely good faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *Id.* at 135, 108 S.Ct. at 1682. An employer will not be said to have acted willfully if it acts reasonably in determining its legal obligation. "If an employer acts unreasonably, but not recklessly, in determining its legal obligation, [its actions] should not be ... considered" willful. *Id.* at 135 n. 13, 108

S.Ct. at 1682 n. 13. It is the plaintiff's burden to show that the violation of the FLSA was willful. *Wyland v. District of Columbia Government*, 728 F.Supp. 35, 37 (D.D.C.1990) (citing *EEOC v. O'Grady*, 857 F.2d 383, 388 (7th Cir.1988)).

In attempting to show willfulness, plaintiff relies heavily on the testimony of Robert Hirsch, a former senior executive of Waldbaum. Hirsch indicated that the higher management of Waldbaum knew of problems of overtime violations. Tr. 65–66. He also testified that he discussed it with both the head of Waldbaum's industrial relations department, Mel Levy, and with Waldbaum's Vice–President, George Brown. Tr. 68–69. Plaintiff also relies on the employees who testified that they brought their complaints to the attention of the store managers, supervisors, and district managers, but without any resolution. Finally, plaintiff relies on the evidence, reviewed above, that the time cards were often not used in calculating the pay for the employees.

 Waldbaum makes four arguments as to why its conduct was not willful. Waldbaum argues that its grant of compensatory time in lieu of overtime payments required by the FLSA was at worst, a means of avoidance which was not materially different than the compensation authorized by law. This argument has no merit. Aside from the question of whether compensatory time could apply to these employees at all, *see infra* n. 5, no records of the time were kept whatsoever. Even if Waldbaum believed that com-

---

would need to be credited, although not necessarily taken, in the week in which it was earned. However, such an argument need not be addressed here because Waldbaum kept no record of the compensatory time awarded. Tr. 1358 (Strub); Tr. 1353 (Quinn). One manager claimed to note compensatory time on the face of the time cards, Tr. 1371–72 (Henry), but those cards were not produced. There was no indication of when the time was taken, or what the proportion was of time worked to time granted. The testimony of compensatory time thus is too vague to be given any weight by the court in negating the defendant's burden under *Mt. Clemens Pottery*.

6. Waldbaum points to one case of contradictory testimony that casts doubt on the reasonableness

of two employees's testimony. Brian Skakel testified that while at store 21 he repeatedly worked extra hours because the opening manager constantly arrived late. Tr. 489. Geraldine Ryan testified that she opened the store three days a week during the period between January and August, 1988, and that she arrived on time. Tr. 540. To the extent that Mr. Skakel's testimony conflicts with Ms. Ryan's, the hours after the end of his shift should be discounted. The court makes this reduction on the basis that employees are presumed to have worked the hours they were assigned. This does not necessarily remove all claims on Mr. Skakel's behalf, because Ms. Ryan was not the opening manager for the entire period that he was working at store 21. He also indicated that some of his extra time came from arriving early, and there were two days a week when Ms. Ryan was not the opening manager.

pensatory time was adequate compensation, failure to keep such records is reckless, at a minimum. Furthermore, both case law and an opinion letter of the Administrator suggest that an employer must pay cash for overtime compensation as it is earned, and may not credit employees with compensatory time for overtime earned that is to be taken at a later date. *See Wage & Hour Opinion Letter No. 913,* December 27, 1968; *Dunlop v. New Jersey,* 522 F.2d 504, 510 (3d Cir. 1975), *vacated and remanded without opinion, New Jersey v. Usery,* 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202 (1976). Disregarding such precedent diminishes Waldbaum's argument of good faith.[7]

■ Waldbaum also asserts that its lack of recklessness can be determined from its good faith cooperation in the Plaintiff's investigation. This good faith is supposedly evidenced by the contention that Waldbaum has not retaliated against, demoted or terminated any employee because of his or her cooperation in the suit. Def.Post–Tr.Mem. at 133–34. The court agrees that retaliatory measures would certainly indicate recklessness, and more. But the lack of retaliation against employees, once this litigation began, is not determinative regarding past conduct.

■ The court also finds unconvincing the argument that Waldbaum was unaware of any uncompensated hours worked by the affected employees because of its good faith reliance upon reporting procedures established by the collective bargaining agreement. The lone section of the Agreement on which Waldbaum relies is section (cc), requiring that "permanent written records of all paid hours of employees, as required by ERISA, shall be maintained by the Employer and reported and made available to the Trustee of the Local 338 Retirement Fund." Def.Exh. CX, CW, Appendix A. From this and the time punching procedures outlined above, Waldbaum maintains that it had a satisfactory procedure, in accordance with the Agreement, to record the work hours accurately. But this evidence merely establishes that defendant superficially had a pro-

cedure, one which Waldbaum was to honor under both the FLSA and the Agreement. Whether Waldbaum recklessly disregarded its own procedures is another question. Defendant asserts that any required payments not made resulted from failure of the employees to report their work. But as discussed above, the court finds that the employees either reported their hours and were not compensated or that they chose not to report hours because of the futility in doing so. *See infra* at pp. 6–12. Additionally, the trial testimony of some employees that they did not speak to members of Waldbaum's higher management regarding the lack of pay for hours worked, *see* Tr. 562–63 (Grant), Tr. 723 (Cedeno), does not negate the statements of those employees who testified that they did have such conversations. Pl.Exh. 25, p. 10, 15 (Plambeck Dep.); Pl.Exh. 26, p. 12 (Rambert Dep.); Pl.Exh. 3, p. 24 (Chatfield Dep.); Tr. 304–06 (Voll); Tr. 242–45 (Scheck); Tr. 334–35 (Merrill); Tr. 701–02 (Martino).

■ Waldbaum's remaining argument, however, has force. Waldbaum asserts a good faith belief during the relevant period that the employees were bona fide executives within the meaning of 29 U.S.C. § 213(a)(1) and the regulations promulgated thereunder. Other courts have held that a good faith belief does not preclude a finding of willfulness. *Donovan v. Sabrine Irrigation Co., Inc.,* 695 F.2d 190, 196 (5th Cir.), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1387 (1983); *Hill v. J.C. Penney Co.,* 688 F.2d 370 (5th Cir.1982); *Dole v. Solid Waste Services, Inc.,* 733 F.Supp. 895, 927 (E.D.Pa.1989), *aff'd,* 897 F.2d 524, *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). After *Richland Shoe,* the appropriate question appears to be whether the good faith belief was held and whether holding the belief was objectively reasonable, unreasonable, or reckless. *See Blackmon v. Brookshire Grocery Co.,* 835 F.2d 1135, 1137 (5th Cir.1988) (using standard that would be adopted in *Richland Shoe,* court found trial court's finding of good

---

7. The precedent suggests, however, that once the overtime has been paid, an employer may lay off the employee for a sufficient number of hours in other weeks at the proper compensatory rate, i.e., time or time-and-a-half.

faith negated suggestion of recklessness, thereby requiring a two year limitation period).

"Bona fide executives" are exempt from the provisions of § 7 under the FLSA. 29 U.S.C. § 213(a)(1). The term "bona fide executive" is defined by six characteristics set forth in 29 C.F.R. § 541.1; five of these characteristics constitute a "duties" test and the sixth constitutes a "salary" test. Waldbaum contends that during the time of the violations, it believed that the subject employees satisfied the two tests, and thus were exempt. However, Waldbaum claims that the Second Circuit's decisions in *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611 (2d Cir. 1991), *cert. denied,* — U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992) and *Whitmore v. Port Authority of New York & New Jersey,* 907 F.2d 20 (2d Cir.1990) clarified the law regarding executive exemption within the meaning of 29 U.S.C. § 213(a)(1). As a result, Waldbaum withdrew the affirmative defense that the subject employees were bona fide executives both in this action and in the action pending in the Eastern District of New York.

The fact that Waldbaum raised as an affirmative defense the executive status argument at the outset of this and other litigation suggests that they indeed held a good faith belief. What needs to be examined is the reasonableness of success of Waldbaum's argument prior to the aforementioned Second Circuit opinions.

Through the testimony of Vice–President of Store Operations, John Luchetti, Waldbaum provided descriptions of the duties of the subject employees. Tr. 1199–1200. From that testimony Waldbaum provided at least colorable evidence that (1) the primary duties of the employees consisted of managing a department, (2) the employees customarily supervised two or more other employees, (3) the recommendations of the subject employees as to hiring and firing were given weight, (4) the employees had discretionary powers, and (5) the employees did not devote more than 40% of their hours to duties not directly related to the work heretofore described. This evidence meets the five characteristics of the "duties" test. 29 C.F.R. § 541.1(a)-(e). Mr. Luchetti's testimony was verified, in part, by Melvin Levy, Vice President of Industrial Relations, who testified that the subject employees had the right to recommend promotions because they ran their own departments. Tr. 1380–81. Indeed, the testimony confirmed much of the employee testimony as to their duties, except for the calculation of no more than 40% of the time spent on non-managerial work. Nevertheless, Waldbaum at least raised an inference that such was the case; the employees are department heads. Thus, even if the court were to conclude that given the hours worked, the 40% figure was exceeded, Waldbaum's contention would not be in reckless disregard of the law.

The Second Circuit cases which Waldbaum claims changed its belief did not deal with the duties test, but only with whether the employees were paid at an hourly rate or were salaried employees. In *Whitmore,* the court held that where an employee could be docked pay for a fraction of a workday missed, then the employee is an hourly employee within the meaning of the C.F.R. provisions applicable to the FLSA. 907 F.2d at 21. In *Malcolm Pirnie,* the court, in relevant part, reaffirmed that "if an employer has a policy of reducing an employee's compensation for fractions of the days that the employee is absent from work, then the employer may not invoke the 'bona fide executive' exemption with regard to the employee." 949 F.2d at 615.

As to the "salary" test, Waldbaum points only to section "g" of Appendix A of the collective bargaining agreement, which provides, in full:

(g) Assistant managers and grocery, produce, dairy-frozen food, appetizing delicatessen department heads so employed prior to October 1, 1971 or January 2, 1972 (whichever is appropriate) shall each be guaranteed their overtime worked prior to October 1, 1971 or January 2, 1972 (whichever is appropriate) during the 5 day work week, but only up to 12 hours during such 5 day week.

Def.Exh. CW, CX. Waldbaum claims this provision "blurred the characterization of the employees as 'salaried' or 'hourly' in nature.

The imposition of Waldbaum through collective bargaining negotiations of an obligation to make available guaranteed overtime militates towards a finding of Waldbaum's good faith treatment of the affected employees as exempt." Def.Post–Tr.Mem. at 120. An argument does exist, thin though it may be, that the guarantee of extra hours, if the employee agrees to work them, places the employee in an hourly category rather than a salaried one. Whether section "g" of the Agreement "blurred" the difference between salaried and hourly employees, however, is not affected by *Whitmore* and *Malcolm Pirnie*. Rather, those cases make clear that the subject employees could not be considered salaried because they were docked for hours they did not work. Section "g" of the Agreement only created a guaranteed minimum, not a guaranteed wage independent of hours worked.

Nevertheless, the court concludes on the evidence before it that Waldbaum's argument prior to 1990 was at least colorable. The duties test was likely met, and there was confusion as to whether deductions for hours not worked would render an employee salaried or hourly. Still, this argument must be characterized as unreasonable. Waldbaum required significantly more evidence regarding the basis of its belief that the subject employees met the salaried test. Exemptions from the FLSA are construed narrowly against the employer. *See Malcolm Pirnie*, 949 F.2d at 614; *Blackmon*, 835 F.2d at 1137 (citing *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959)). Without more, Waldbaum had little hope of success. Still, Waldbaum's argument was not so baseless as to evidence reckless disregard of the law. Accordingly, the court concludes that Waldbaum has shown that it did not act willfully in violating the FLSA, and thus the applicable statute of limitations for this action is two years.

### III. DAMAGES

■ Having found Waldbaum to have violated §§ 7 and 11(c), the court must now address the issue of damages. Defendant makes a series of arguments about the inaccuracy of the government's calculations. However, "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act." *Mt. Clemens Pottery*, 328 U.S. at 688, 66 S.Ct. at 1193. Where an employer has received the benefit of work that has gone uncompensated due to inaccurate records, even where there is a bona fide mistake, the employer cannot object to damages on the basis of the most accurate calculation possible. *Id.* This position is not precluded by a rule against uncertain and speculative damages because that rule applies where a question exists about the damage itself, not its extent. *Id.* Thus, where there is an imprecise measure of damages because of inaccurate records kept in violation of § 11(c), "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). "It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages." *Mt. Clemens Pottery*, 328 U.S. at 688, 66 S.Ct. at 1193.

### A. *Calculation of Damages*

Guided then by *Mt. Clemens Pottery*, the court must determine whether the calculations offered by the government are reasonable. Scott Valentine, a computer specialist with the Labor Department, testified as to the method of computation. He created Plaintiff's Exhibit 35, which lays out the wage hour claims made by the Secretary. Rates of pay and hours actually paid were determined from the payroll records that Waldbaum supplied to the plaintiff. Tr. 1060. The workweeks were designated as regular workweeks and nonovertime workweeks, the latter being workweeks where the employee's actual hours plus overtime totaled less than 40 hours. No back wages were calculated for nonovertime workweeks. Tr. 1062. Waldbaum was also credited with a portion of the hours paid on Sunday at a double time rate, because the Act only re-

quires time-and-a-half for overtime hours. Tr. 1070–71.

In Exhibit 35, in addition to the information from the Waldbaum payroll, plaintiff lists the total actual hours worked and the basis for that work. Tr. 1066. These are the only figures that cause controversy, for the remaining numbers are generated by simple calculations to determine the amount due, based on an employees' hourly rate, after accounting for hours already paid.

The actual hours worked were calculated either by statements from the employees, by within-store averaging, or by across-store averaging. Tr. 1067. The statements were from deposition testimony and statements collected by the Labor Department.[8] Within-store averaging is a technique by which the actual hours worked for all employees within the same store from whom statements were obtained are averaged. Tr. 1072. Included in these averages are statements by employees that they were paid for all of the hours worked. Tr. 1073. For positions in certain stores where there was insufficient data to perform within-store averaging, the plaintiff performed cross-store averaging. Cross-store averaging takes the average of all hours worked by all employees in the same position in all stores. Tr. 1075. Again, in these calculations, statements of no violations were included with statements of violations. _Id._ In both within-store and cross-store calculations, different job categories were never mixed. Tr. 1076.

█ On its face, the court finds that overall method of calculation to be reasonable. Where possible, the claims are made on the basis of specific sworn testimony. If sworn testimony is unavailable, statements are used from the employee on whose behalf the claim is made. Within-store averaging, which is the secondary means of calculation, compares only similarly situated employees within the same store. Although factors effecting work times vary from day to day and from shift to shift, the court finds this type of averaging, over the course of two years, to be sound.

There is sufficient commonality of conditions and type of work to satisfy a reasonableness standard. _See McLaughlin v. DialAmerica Marketing, Inc.,_ 716 F.Supp. 812, 825 (D.N.J. 1989) (average hours derived from trial and deposition testimony of 43 employees was sufficient to award back wages to 300 employees with whom commonality was shown); _Kaszycki & Sons Contractors,_ 599 F.Supp. at 868 (testimony of 29 non-union employees involved in demolition sufficient to compensate in excess of 200). As to cross-store averaging, the defendant contends that conditions from store to store vary significantly enough to raise concern that some employees will be overcompensated under this method. However, because data from all twenty subject stores is used, the base is broad enough to mitigate against extreme claims. Indeed, of the more than 140 claims made on this basis, only six are in excess of $10,000. Defendant must also remember that this is an averaging technique, one used as the least preferred method. Just as some employees are overcompensated by the calculations, others are undercompensated. Although not ideal, the method is reasonable. _Id.; Beliz v. W.H. McLeod & Sons Packing Co.,_ 765 F.2d 1317, 1330–31 (5th Cir.1985); _see Leonard v. Carmichael Prop. & Management Corp.,_ 614 F.Supp. 1182, 1186 (S.D.Fla.1985) (where employer fails to keep records, employees who demonstrate some work performed have a right to recovery, even where damages are uncertain and difficult to calculate, thereby allowing approximation).

The defendant attacks this methodology on a number of grounds. Waldbaum raises complaints as to the credibility of the trial testimony, depositions, and statements as the underlying basis of the calculations. The court has already determined that it found the testimony of the witnesses credible. As to the depositions, this court adhered to the prior ruling of Judge John E. Sprizzo of this court on March 24, 1992 ordering that the depositions of witnesses would be used in place of live trial testimony except to the

---

8. Some of the statements are now based on trial testimony. The court directed the plaintiff to note discrepancies between trial testimony of the employee witnesses and its basis for wage calcu-lations for those employees. The plaintiff after trial submitted Supplemental Exhibit 35 to reflect the trial testimony.

extent that a party which questions a witness' credibility wishes to conduct live cross-examination. This court allowed defendant limited cross-examination. Nothing revealed in the courtroom casts doubt on the validity of the sworn depositions taken by the defendant.

█ The same cannot be said, however, of the written statements. The court admitted two sets of documents into evidence that were statements made to the government by employees and former employees of Waldbaum. The court admitted the first group of documents as admissible under both Fed. R.Evid. 801(d)(2)(D) and 803(8) as an admission of a party-opponent and as a public record. The second set of documents was also admitted, but only under Fed.R.Evid. 803(8). The court stands by this ruling. However, the mere fact of admission does not govern the weight that the court gives these statements. The court gives these statements weight in verifying the conclusion that Waldbaum employees were not paid for all of the time that they worked. The sheer magnitude of the statements, each attesting to unpaid work hours, when taken with the trial testimony discussed above, is persuasive in establishing that violations of the FLSA took place.

The court cannot give weight, though, to the specific hours claimed to have been worked by those who gave statements. First, the accuracy of the method of collection is poor. Some are mail surveys and questionnaires and others are interviews. *Compare* Pl.Exh. 51 *with* Pl.Exh. 53 *and* Pl.Exh. 54. The thoroughness of the responses varies significantly. Unlike a deposition or trial testimony, there is no affirmation of truthfulness, nor any necessity for accuracy. Trial testimony also indicated that a number of employees were untruthful with the government on the statements or did not fill out the forms accurately. Tr. 511 (Kallman); Tr. 648 (Leon); Tr. 813 (Schaentler); Tr. 161 (Phillips). The court therefore concludes that these statements are sufficiently inaccurate that they should not form the basis of the back wage calculations.

This conclusion has an impact on the plaintiff's claims. By the defendant's estimation, claims based on trial or deposition testimony total $835,704.33 of the back wages due, or slightly more than 56% of the total claimed. Other than for corrections consistent with this opinion, Waldbaum has made no challenge that would upset those claims.[9] Other claims are made on the basis of the statements, however, totaling $203,258.31. The remaining $449,161.48 is based on the averaging techniques already described. Discounting the statements will mean that these claims must now be recalculated using the averaging techniques.[10]

█ Waldbaum makes two additional challenges to the calculations. At trial, a number of witnesses testified that they took breaks and ate meals while at work. Wald-

---

**9.** The court notes that in its post-trial brief, defendant cites several instances where trial testimony and claims made in Supplemental Exhibit 35 are inconsistent. *See* Def.Post–Tr.Mem. at 42–57. To the extent that the amounts in the exhibit are inaccurate, they must be corrected. *See also infra* n. 6.

**10.** The court directs the Secretary to continue to use the statements of no violation in making its averaging calculations. The averaging is meant to take into account all employees in similar positions, and it is undisputed that some employees not represented by the Secretary were properly compensated. Therefore, they must be taken into account in calculating an average.

Plaintiff has also weighted some of the calculations in Supplemental Exhibit 35. Plaintiff represents:

Consistent with the testimony in the Supplemental Exhibit 35 the "hours worked" column in the plaintiff's calculations are increased from the normal weekly hours of work by two hours for the two weeks preceding holidays, by two hours every 4 weeks for the visits of the higher officials, by two hours every 13 weeks for the inventory workweeks, and by one hour every 5 weeks for the late delivery of merchandise. This reconstruction reasonably satisfies the defendant's primary complaint that the plaintiff's computations allege consistent hours of work over long periods of time.

Pl.Post–Tr.Mem. at 15–16. There is no reason for these additions. Plaintiff, like defendant, must remember that the employees testified to averages over long periods of time. Presumably within those averages, considerations were made for weeks preceding holidays and inventory weeks as well as weeks when work was less busy. Therefore, these additions for the averaging techniques are unnecessary and must be excluded from the recalculations.

baum faults the calculations because they do not take into account these breaks which it claims are not compensable under the FLSA. 29 C.F.R. § 785.18 suggests that rest periods running between 5 and 20 minutes are compensable; additional time, however, need not be. 29 C.F.R. § 785.19 provides that bona fide meal times are not compensable. Waldbaum cites *Hill v. United States*, 751 F.2d 810 (6th Cir.1984), for the proposition that bona fide meals are not compensable under the FLSA. Defendant's reliance on *Hill* is misplaced. In *Hill*, the court concluded that the U.S. Postal Service did not violate the FLSA by refusing to compensate letter carriers for half hour lunch periods. Waldbaum asserts that it too has a policy which requires employees to punch out at lunchtime so as not to be compensated. Here, however, there is no challenge to the policy; rather, the policy seemed to go unenforced, as did most of the Waldbaum policies regarding punching time cards. Thus, the plaintiff should not be held responsible for enforcing Waldbaum's policies after the fact by crediting time for these breaks, when there is insufficient evidence that Waldbaum itself enforced these policies.

### B. Liquidated Damages

██ According to § 16(c) of the FLSA, "[t]he Secretary may bring an action ... to recover the amount of unpaid minimum wages or overtime compensation and an equal amount of liquidated damages." 29 U.S.C. § 216(c). § 11 of the Portal Act permits a good faith defense to the liquidated damages provision:

if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion award no liquidated damages or award any amount thereof not to exceed the amount specified in § 216 of this title.

29 U.S.C. § 260. The burden of the good faith defense is on the employer who must show "plain and substantial evidence of at least an intention to ascertain what the Act requires and to comply with it." *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir.1987). However, this burden is a heavy one, because "double damages are the norm, single damages the exception...." *Id.* (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986)).

██ As this court stated previously, in order to prevail on a good faith defense under § 11 of the Portal Act, "the employer must show (1) subjective good faith and (2) objectively reasonable grounds for believing that he was in compliance with the provisions of the FLSA." *Soler v. G & U, Inc.*, 628 F.Supp. 720, 725 (S.D.N.Y.1986), *rev'd on other grounds*, 833 F.2d 1104 (2d Cir.1987), *cert. denied*, 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988). The court has already concluded that the grounds for Waldbaum's argument that its employees were bona fide executives were unreasonable. *See supra* at 1046–1048. The court in its sound discretion therefore awards liquidated damages up to the full amount of the wages withheld, once finally determined. Such an award is merited in light of the extent of the violations, the repeated investigations by and discussions with the plaintiff, and the lack of evidence of good faith, other than in construing the law applicable to bona fide executives.[11]

---

11. The court recognizes that the Secretary has brought claims here under both § 16(c) and § 17 of the Act. Because the Secretary has chosen to bring his claim under both sections, the form of compensatory relief available is unclear. Liquidated damages are not allowed for actions brought solely under § 17; prejudgment interest is the only compensatory remedy. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1063 (2d Cir. 1988). Interest compensates the employees whose wages were withheld, and remedies the competitive disadvantage inflicted on law-abid-ing businesses by denying errant employers the free use of the money it withheld. *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 58 (2d Cir.1984). The compensatory element is particularly compelling in § 17 cases because liquidated damages are unavailable under that section. *Superior Care*, 840 F.2d at 1062–64.

However, compensatory damages are different for § 16 claims. For FLSA actions brought under § 16(b), prejudgment interest may not be awarded in addition to liquidated damages. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697,

## C. Injunctive Relief

Plaintiff has sought two forms of injunctive relief: a restitutionary injunction restraining continued withholding of unpaid backwages and a prospective injunction restraining future violations of the Act. In support of the former, plaintiff relies upon *Donovan v. Grantham*, 690 F.2d 453 (5th Cir.1982). There the circuit court reversed a district court's refusal to issue a restitutionary injunction on the basis of the defendant's good faith in withholding certain wages due employees. The circuit court held that the district court had severely limited discretion to deny a restitutionary injunction which should only be exercised in compliance with the purposes of the Act. *Id.* at 456. "Those purposes are first, the compensation of the employees for their losses and second, the correction of a continuing offense against the public interest by increasing the effectiveness of the Act's enforcement." *Id.* This

latter purpose was said to be met by forcing the violator to relinquish any unfair competitive advantage gained by the violations over complying employers.

█ However, a restitutionary injunction is unnecessary in this case. Plaintiff has brought an action under both §§ 16 and 17 of the Act. The court has already concluded that the Secretary should recover the amounts in question, as allowed under § 16. Plaintiff will have a judgment, and that judgment will be fully enforceable against Waldbaum for the appropriate amount of back wages. The representative employees will be compensated and defendant's competitive advantage will be erased. A restitutionary injunction serves no additional purpose. *See Wilamowsky*, 833 F.2d at 20 (2d Cir.1987) ("The compensatory purpose of the Act generally will be as well served by a judgment

712–14, 65 S.Ct. 895, 904–06, 89 L.Ed. 1296 (1945). However, some compensation is necessary. Section 16(c) was amended in 1974, in part, to permit the Secretary to recover both unpaid compensation and liquidated damages as private plaintiffs were already permitted under § 16(b). *See Marshall v. Frozen Assets Ltd.*, 513 F.Supp. 591, 594 (E.D.Mo.1981) (citing H.R.Rep. No. 913, 93rd Cong. 2nd Sess. 2 (1974), *reprinted* at 1974 U.S.C.C.A.N. 2811, 2850).

The Courts of Appeals are split as to recovery of prejudgment interest under section 16(b) where liquidated damages have been denied. *Compare Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993) *and McClanahan v. Mathews*, 440 F.2d 320, 325–26 (6th Cir.1971) *and Holtville Alfalfa Mills v. Wyatt, Inc.*, 230 F.2d 398, 401 (9th Cir.1955) *with Barcelona v. Tiffany English Pub, Inc.*, 597 F.2d 464 (5th Cir.1979), *Foremost Dairies, Inc. v. Ivey*, 204 F.2d 186 (5th Cir.1953), *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 96 (2d Cir.), *cert. denied*, 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953), and *Landaas v. Canister Co.*, 188 F.2d 768 (3d Cir.1951). In *Landaas*, the Third Circuit concluded that where a district court had awarded no liquidated damages, prejudgment interest was properly denied. The court relied on the Supreme Court's holding in *Brooklyn Savings Bank* that interest could not be granted in addition to liquidated damages in cases brought under § 16(b). The court reasoned that because the district court had discretion to award liquidated damages, a decision to deny liquidated damages meant a denial of interest, which is merely an alternative form of compensation for delay in payment of back wages. *Landaas*, 188 F.2d at 772 n. 10. The Second Circuit followed *Landaas* without commentary on denying interest in *Addison*, 204 F.2d at 96.

As to recovery under § 16(c), only one district court appears to have addressed the question regarding prejudgment interest when liquidated damages have been denied. In *Marshall*, the district court held that prejudgment interest was not recoverable where liquidated damages were denied, as both forms of relief compensate the same injury. The Fifth Circuit has drawn a general distinction that prejudgment interest is never available for claims brought under § 16 of the Act but may be available for § 17 claims, although the reason for this distinction "for purposes of prejudgment interest is not readily apparent." *Knowlton v. Greenwood Independent School Dist.*, 957 F.2d 1172 (5th Cir.1992) (quoting *Peters v. City of Shreveport*, 818 F.2d 1148, 1168 (5th Cir.1987)). Thus the rule in this circuit appears to be, following *Addison*, that where liquidated damages are denied under § 16, prejudgment interest must also be denied.

Because the compensatory relief allowed under § 17 precludes the form of compensatory relief under § 16 and vice versa, a decision must be made as to the form the Secretary is allowed to pursue when he brings a claim under both sections simultaneously. In *Superior Care*, Chief Judge Newman, analyzing a claim brought only under section 17, concluded "[h]ad the Secretary wanted to be sure that he could get liquidated damages, he could have amended his complaint to seek overtime wages under section 16(c)." 840 F.2d at 1061. The court presumes, then, that as to compensatory damages, the Secretary should be allowed to pursue liquidated damages under his section 16(c) claim to the exclusion of any collection of prejudgment interest allowable under section 17.

for money damages as it will be by a restitutionary injunction in the same amount").[12] *Donovan* is not applicable, because the Secretary there brought only a § 17 action. Here, the Secretary's goal of forcing disgorgement of back wages has already been met.

The court reaches a different conclusion as to a prospective injunction. As the Sixth Circuit has recently stated with regard to prospective injunctions under the FLSA:

The purpose of issuing an injunction against future violation is to effectuate general compliance with the Congressional policy of abolishing substandard labor conditions by preventing recurring future violations. Prospective injunctions are essential because the cost of noncompliance is placed on the employer, which lessens the responsibility of the Wage and Hour Division in investigating instances of noncompliance. The imposition of an injunction is not punitive, nor does it impose a hardship on the employer "since it requires him to do 'what the Act requires anyway—to comply with the law.'"

*Martin v. Funtime, Inc.*, 963 F.2d 110, 113–14 (6th Cir.1992); *see McLaughlin v. DialAmerica Marketing, Inc.*, 716 F.Supp. 812, 826–27 (D.N.J.1989) (injunctions are issued because of public interest and to relieve Secretary of burden of administration of enforcement); *Hodgson v. Parke*, 324 F.Supp. 1297, 1300 (S.D.Tex.1971) (primary function of injunction is to shift responsibility for monitoring compliance from the Labor Department). Among the factors to consider in issuing the injunction are the previous conduct of the employer, the dependability of his promises of future compliance, and evidence of current compliance, although current behavior alone is not a reason for denying entry of an injunction. *Funtime*, 963 F.2d at 114.

The court concludes that an injunction should issue here. The long history between the parties, with eight previous investigations undertaken by the Secretary over the last thirty years, suggests that an injunction would help foreclose the need for additional, extensive investigations. There is also no evidence on behalf of Waldbaum of "substantial cooperation," *Wilamowsky*, 833 F.2d at 20, or of "extraordinary efforts to prevent recurrence," *Brock v. Big Bear Market No. 3*, 825 F.2d 1381, 1383 (9th Cir.1987). Indeed, Waldbaum did not address the issue of an injunction in its post-trial submissions. The only evidence of cooperation is Waldbaum's lack of retaliation, which is hardly evidence of the likelihood of future compliance. Furthermore, at least one Waldbaum employee testified that he had worked hours for which he had not been paid one week before the trial began. Tr. 719 (Cedano). He also testified that after the beginning of the suit, "There may have been some changes and they might have followed up on them for a few weeks. Then they went back to the same routine. The job has to get done." Tr. 721. The court concludes that it should enjoin future violations of the Act by Waldbaum.

## CONCLUSION

For the foregoing reasons, the court concludes that Waldbaum violated §§ 7 and 11(c) of the FLSA, and is liable for the amount of back wages withheld. Plaintiff is directed to submit new calculations with regard to damages in conformity with this opinion. Because the court concludes the violations were not willful, the appropriate period of recovery is two years. Liquidated damages are granted equaling the full amount of wages withheld, therefore eliminating any award of prejudgment interest. No restitutionary injunction will issue. However, a permanent injunction is issued henceforth restraining the defendant, its officers, agents, servants, employees, and those persons in active concert or participation with Waldbaum, Inc. from prospectively violating

---

12. The lack of need for a restitutionary injunction in a § 17 action when damages have already been awarded under § 16 is another result of the Secretary bringing simultaneous actions for the same alleged violations. *See supra* n. 11. Because the Act now allows the courts to exercise both their legal and equitable powers in actions brought by the Secretary, the form of relief which compels restitution, without regard to additional liquidated damages or interest, is irrelevant.

the provisions of §§ 7, 11(c), 15(a)(2), and 15(a)(5) of the FLSA.

Plaintiff to submit a judgment in conformity herewith. This Opinion shall constitute the findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

SO ORDERED.