833 F.2d 11
 28 Wage & Hour Cas. (BN 608, 107 Lab.Cas. P 34,986
 William E. BROCK, Secretary of Labor, U.S. Department of
Labor, Plaintiff- Appellee, Cross-Appellant,
v.
Judith WILAMOWSKY d/b/a Continental Word Processing, Inc.,
Defendant-Appellant, Cross-Appellee.
 Nos. 1090, 1179, Dockets 87-6026, 87-6028.
 United States Court of Appeals,
Second Circuit.
 Argued June 8, 1987.
Decided Oct. 30, 1987.
 
 William J. Stone, Washington, D.C. (George R. Salem, Monica Gallagher, Linda Jan S. Pack, Patricia M. Rodenhausen, U.S. Dept. of Labor, Washington, D.C., on the brief), for plaintiff-appellee-cross-appellant.
 Nathan Lewin, Washington, D.C. (Stephen L. Nightingale, Randall J. Turk, Miller, Cassidy, Larroca & Lewin, Washington, D.C., on the brief), for defendant-appellant-cross-appellee.
 Before KEARSE, ALTIMARI, and MAHONEY, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendant Judith Wilamowsky, doing business as Continental Word Processing, Inc. ("Continental" or the "Company"), appeals from so much of a final judgment of the United States District Court for the Southern District of New York, 639 F.Supp. 1166, Kevin Thomas Duffy, Judge, as found that Continental had willfully violated the overtime compensation provisions of the Fair Labor Standards Act, 29 U.S.C. Sec. 201 et seq. (1982) ("FLSA" or the "Act"), and required the Company to pay plaintiff Secretary of Labor (the "Secretary"), on behalf of certain of its employees, $76,436.33 as compensation for unpaid overtime for the period June 1, 1982, to December 31, 1985, plus an equal amount as statutory "liquidated damages" for the same period, and $7,222.25 in overtime compensation for the period January 1, 1986, to June 30, 1986. On appeal, Continental contends that the district court erred (1) in concluding that the Company's compensation schedule did not comply with the Act, (2) in awarding liquidated damages, and (3) in ruling that the proper limitations period was three years rather than two. The Secretary cross-appeals, contending principally that the district court should also have awarded liquidated damages for the period January 1, 1986, to June 30, 1986, and should have granted injunctive relief. For the reasons below, we reverse so much of the judgment as denied liquidated damages for the period after December 31, 1985, and in all other respects we affirm.
 
 I. BACKGROUND
 
 2
 The basic facts are not in dispute. Continental is an employment agency that provides temporary word processor operators to law firms and other businesses in the New York metropolitan area on an around-the-clock basis, seven days a week. The Company's main office, which is open 9 a.m. to 5 p.m., Monday through Friday, takes calls from firms requesting such operators on a temporary basis, short term or long term, and places operators with these clients on the basis of their work skills and availability.
 
 
 3
 Although the parties have stipulated that, for the purposes of this litigation and on the present record, the word processor operators are "employees" of Continental within the meaning of the Act, the employment relationship is not of the traditional sort. Word processor operators may accept assignments from more than one agency and thus may be "employees" of more than one employment agency at a time; they are not required to accept any given assignment and may decline jobs for any reason, without penalty; they may agree, at a client's request, to stay on a job beyond the hours originally requested from Continental; and they may accept assignments directly from clients. Operators are also free to work during any work period and to work different hours from day to day or from job to job.
 
 
 4
 In a given week, Continental employs approximately 200 temporary word processors. These operators may work in one or more of three work periods--a day shift, from 8 a.m. to 5 p.m.; an evening shift, from 5 p.m. to 12 midnight; and a night shift, from midnight to 8 a.m. Continental pays its operators at different hourly rates for each shift. From June 1, 1982, to February 1, 1985, the basic pay scale for the most experienced operators was $12 per hour during the day shift, $15 per hour during the evening shift, and $18 per hour during the night shift. On February 1, 1985, these rates were increased to $13 per hour during the day shift, $16.50 per hour during the evening shift, and $19.50 during the night shift. Operators whose work for a client extended from one shift into another were paid for hours worked in the latter shift either at the rate scheduled for the latter shift or at the rate payable for the initial shift, whichever was higher.
 
 
 5
 Section 7 of the FLSA requires in general that an employee who works more than 40 hours in a given week be paid for the excess at a rate "not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. Sec. 207(a)(1). At the times pertinent to this action, Continental treated the rate scheduled for the day shift as the operator's "regular rate" of pay and treated the amounts by which the rates for evening and night work exceeded the day rate as premiums creditable toward any statutorily required payments for overtime. Continental claims that any operator who logged more than 40 hours of client work in a given week was paid either (a) the total wages payable according to the scale rates for time actually worked, or (b) the day shift rate for 40 hours plus one-and-one-half times that rate for any hours worked in excess of 40, whichever was higher.
 
 
 6
 The Secretary commenced the present action in February 1985, alleging that Continental had failed to pay its operators one-and-one-half times their regular rate of pay for time worked in excess of 40 hours per week, in violation of 29 U.S.C. Secs. 207(a)(1) and 215(a)(2). The Secretary's principal premise was that the operator's regular rate of pay was the weighted average hourly rate of all compensation received by him or her, i.e., a rate that is properly calculated by adding all of the wages payable for the hours worked at the applicable shift rates and dividing by the total number of hours worked. The Secretary sought, inter alia, an award of back wages for underpaid employees, an equal amount of liquidated damages pursuant to 29 U.S.C. Sec. 216, and an injunction against further violations.
 
 
 7
 The parties entered into a stipulation in which they agreed, inter alia, that Continental's operators were entitled to be paid one-and-one-half times their regular rate of pay for hours worked in excess of 40, but disagreed as to how the regular rate of pay was to be computed. To illustrate the disagreement, the stipulation set forth examples, the clearer of which may be summarized as follows. In a given week, employee X worked during three shifts for which Continental paid him at the following rates:
 
 
 8
 Hours Worked Rate Amounts Paid
------------ ---- ------------
27.00 day $12 $324.00
10.25 evening 15 153.75
12.50 night 18 225.00
 Totals 50.00 (sic) $702.75
 
 
 9
 Continental contended that the Act entitled X to $12 per hour for 40 hours ($480) plus $18 (time and a half) per hour for the remaining 10 [sic ] hours ($180), or a total of $660. Under the Company's interpretation, therefore, X's actual compensation of $702.75 exceeded the statutory minimum. The Secretary, on the other hand, contended that X's regular rate of pay was $702.75 (the total paid according to the Company's scale) divided by 50 [sic ] (the total hours worked), or $14.06 per hour. He contended that X should have been paid $14.06 per hour for 40 hours ($562.40) plus $21.09 (time and a half) per hour for the remaining 10 [sic ] hours ($210.90), or a total of $773.30. Under this interpretation, X was paid $70.55 less than the statutory minimum.
 
 
 10
 Following motions by both sides for summary judgment, the district court, in an opinion reported at 639 F.Supp. 1166 (1986), concluded that the statutory regular rate was, as argued by the Secretary, the weighted average hourly rate of all compensation received by the employee. The court noted that the record included several affidavits of Continental's temporary word processors to the effect that they believed the "regular rate" to be the amount paid for work performed between 8 a.m. and 5 p.m., Monday through Friday, and affidavits from a like number of such employees stating that they had never been advised by the Company that any particular period constituted either the normal workday or the normal workweek. Accordingly, given the acknowledged ability of these employees to work in any shift they wished and for however long they wished, the court found that the Company had "no 'applicable employment contract or collective[-]bargaining agreement' determining in 'good faith [...] the basic, normal, or regular workday' as required by [29 U.S.C. Sec.] 207(e)(7)," and that the higher rates paid to operators working the evening and night shifts were an integral part of the employees' regular rate. Id. at 1169. The court concluded that Continental had failed to pay the minimum overtime wages required by the FLSA.
 
 
 11
 The court found that Continental had known it was covered by the Act, yet had failed to conform its practices to the Act's requirements. Accordingly, applying the standard set by this Court in Donovan v. Carls Drug Co., 703 F.2d 650 (2d Cir.1983), the court concluded that the Company's violation was "willful" and applied a three-year, rather than a two-year, statute of limitations pursuant to 29 U.S.C. Sec. 255(a). It thus awarded the Secretary $76,436.33 for the period June 1, 1982, to December 31, 1985, and $7,222.25 for the period January 1, 1986, to June 30, 1986, amounts stipulated by the parties, as back overtime compensation.
 
 
 12
 Further, the court found that though Continental had known it was subject to the Act, it had failed to seek an opinion, either from counsel or from the Secretary, and had taken no other steps to determine the lawfulness of its pay practices, until after an official investigation had been commenced. Finding, therefore, that Continental had lacked reasonable grounds for believing that its overtime pay practice did not violate the Act and that the Company had not acted in good faith within the meaning of 29 U.S.C. Sec. 260, the court awarded the Secretary liquidated damages pursuant to 29 U.S.C. Secs. 216, 260, in an amount equal to the compensatory damages for the pre-1986 period. The court did not award liquidated damages for the period January 1 to June 30, 1986.
 
 
 13
 The Secretary requested a rehearing, urging the court to enjoin Continental from any further violations of the Act. The court denied the request, stating that the Secretary had made no factual showing sufficient to indicate the need for an injunction.
 
 
 14
 These appeals followed.
 
 II. DISCUSSION
 
 15
 Continental appeals from the judgment against it, contending that the district court erred (1) in rejecting the Company's interpretation of "regular rate" and should have concluded that the Company's overtime payment practices did not violate the Act, (2) in finding that the Company's practices were not in good faith and sufficiently grounded in reason to avoid an award of liquidated damages, and (3) in ruling that the Company's violation was willful, thus triggering a limitations period of three years rather than two. The Secretary cross-appeals, contending principally that the district court should have (1) awarded liquidated damages for the period January 1, 1986, to June 30, 1986, (2) granted relief in the form of a restitutionary injunction rather than a monetary award of damages, and (3) enjoined any further violations of the Act.
 
 
 16
 We have considered all of the arguments advanced by the parties in support of their respective appeals and find merit only in the Secretary's contention that the court should have awarded liquidated damages for the period January 1, 1986, to June 30, 1986.
 
 A. The "Regular Rate" of Compensation
 
 17
 To the extent pertinent to the present controversy, FLSA Sec. 7(a)(1) provides as follows:
 
 
 18
 (1) Except as otherwise provided in this section, no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.
 
 
 19
 29 U.S.C. Sec. 207(a)(1). Section 207(e) defines "regular rate," in pertinent part, as follows:
 
 
 20
 As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include--
 
 
 21
 ....
 
 
 22
 (7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a) of this section [) ], where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek.
 
 
 23
 29 U.S.C. Sec. 207(e)(7) (footnote omitted). Section 207(e)(7) is also known as a "clock overtime" provision because it deals with premium compensation that is equal to the minimum statutory overtime rate, but is payable solely on the basis of the time of day in which the work is performed, independent of the number of hours worked. Under the terms of the Act, the premium portion of the clock overtime payment not only is not part of the "regular rate," id., but also is creditable toward the required overtime compensation. 29 U.S.C. Sec. 207(h).
 
 
 24
 Continental contends that it was entitled to judgment in its favor because the evening- and night-shift portions of its pay schedule are premium rates that provide "extra compensation" within the meaning of Sec. 207(e)(7) and that it has thus complied with the Act. Alternatively it argues that since the night-shift portion of its pay schedule is one-and-one-half times its day-shift rate, and Congress intended that the Act be interpreted flexibly, we should (a) conclude that the night-shift rate complies fully with the Act and (b) require that the Company be given credit for the evening-shift premiums. We disagree.
 
 
 25
 Preliminarily, we note that, as the district court found, there was no collective bargaining agreement establishing Continental's day shift as the basic, normal, or regular workday. And, given the conflicting affidavits from employees, it is hardly clear that a trier of fact would find that there was a contract or agreement between Continental and its word processor employees establishing such a workday in good faith. Thus it is questionable whether Continental meets the contract-or-agreement requirement of Sec. 207(e)(7) for good-faith establishment of a regular workday.
 
 
 26
 More importantly, as a matter of law the Continental pay schedule plainly did not meet the quantitative prerequisites set by Sec. 207(e)(7) for minimum clock overtime compensation, for Sec. 207(e)(7) deals with premium rates that are "not less than one and one-half times" the established regular rate. For example, after February 1, 1985, Continental's rate for the evening shift, $16.50, was roughly one-and-one-quarter times the $13 day-shift rate that Continental contends was the "regular rate." Thus, it is clear both that the evening premium rate alone was less than one-and-one-half times the alleged regular rate and that the evening and night premium rates, when averaged, were less than one-and-one-half times the alleged regular rate. Second, though the night rate viewed in isolation was one-and-one-half times the day rate, the fact that the evening rate was less than one-and-one-half times the day rate means that the evening rate itself must be factored in to determine what the regular rate was, for the very definition of regular rate in Sec. 207(e)(7) includes any off-hours premium as part of the regular rate if those premium rates are less than one-and-one-half times the basic rate. When Continental's evening rate is included in determining the regular rate, the regular rate was not $13 per hour but was more than $14.50 per hour, and even the night-shift rate of $19.50 per hour was less than one-and-one-half times the regular rate.
 
 
 27
 Continental argues that if its pay schedule contained only the day-shift rate and the night-shift rate, with no intermediate rate, that schedule would meet the quantitative requirements of Sec. 207(e)(7), and it contends that Congress would have intended that the employer be given credit, rather than be penalized, for adding an intermediate premium to its schedule. We see no basis in the legislative history for inferring that Congress had in mind a treatment at variance with that spelled out in the Act. The original clock overtime provision that was the forerunner to Sec. 207(e)(7) was added to the FLSA in 1949 to solve the problem experienced in particular by the longshore and stevedoring industries, and to an extent by "other industries, such as electric and gas utilities, where continuous operations are essential," in complying with the Act. See S.Rep. 402 ("S.Rep. 402"), 81st Cong., 1st Sess., reprinted in 1949 U.S.Code Cong. & Admin.News ("USCCAN") 1617. In these industries, it had been "customary for employers and labor organizations representing the employees to provide by contract that compensation at the rate of one and one-half times the straight-time rate shall be paid for work outside the straight-time hours stipulated in the contract." Id. at 1619. In the longshore and stevedoring industries, "[o]ne of the purposes of this arrangement, substantially realized, was to concentrate the work of the longshoremen in the straight-time hours. The intended effect of such concentration was to bring about the employment of more men as there is pressure for more work to be done in the straight time hours." Id. at 1619-20 (footnote omitted).
 
 
 28
 The original FLSA, which required that overtime be paid at the rate of one and one-half times the "regular rate" of pay, unfortunately contained no definition of "regular rate," and the Supreme Court's interpretation of the Act was that the premium rates paid for work outside the "straight-time" hours were includable in calculating the regular rate. See Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948). Congress agreed with the employers that this interpretation resulted in the employers' paying overtime on overtime, and, to eliminate this effect, it enacted the so-called clock overtime provisions. S.Rep. 402, 1949 USCCAN at 1619-22.
 
 
 29
 This history does not suggest that Congress intended its clock overtime provision to apply in circumstances where, for some of the nonregular periods, the employer paid less than one-and-one-half times the basic rate. Every mention of the problem referred to employers who were paying, for the entire non-straight-time period, at least the rate required in the Act's overtime provisions. Consistent with this history, the Secretary has issued an interpretative bulletin, which is due some deference, interpreting the clock pattern exception to be applicable only when all, not just some, non-straight-time hours are compensated at time-and-one-half. See 29 C.F.R. Sec. 778.204 (1986).
 
 
 30
 Thus, both the Act's legislative history and its administrative interpretation, no less than its explicit language, require that we uphold the district court's conclusion that Continental's pay schedule does not comply with the overtime compensation provisions of the Act, and that the Company is not entitled to credit for the premium portions of its evening and night rates. If there is any merit in Continental's belief that Congress would not have intended application of Sec. 207(e)(7) in accordance with its terms to the business of agencies such as Continental, the Company's remedy is to seek an amendment of those terms by Congress.
 
 B. The Statute of Limitations
 
 31
 The FLSA provides in general a two-year statute of limitations on actions to enforce the Act, but provides a three-year limitations period for "a cause of action arising out of a willful violation." 29 U.S.C. Sec. 255(a). In determining that Continental's violation was willful, the district court applied the standard established in Donovan v. Carls Drug Co., 703 F.2d 650, in which this Court ruled that "[e]mployers 'willfully' violate FLSA when (1) they know that their business is subject to FLSA and (2) their practices do not conform to FLSA requirements." 703 F.2d at 652. Accord Secretary of Labor v. Daylight Dairy Products, Inc., 779 F.2d 784, 789 (1st Cir.1985); Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir.1971), cert. denied, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). We rejected the notion that a violation could not be willful unless the employer knew it was violating a specific provision of the Act, reasoning that such a rule would invite employers to remain ignorant of the precise terms of the Act.
 
 
 32
 In making their various arguments to this Court, neither party contends that any of the district court's findings of historical fact are clearly erroneous, see Fed.R.Civ.P. 52(a), or that those findings were not sufficient to support the conclusion that the Company's violation was willful within the meaning of Carls Drug. Each, however, urges us to abandon the Carls Drug standard, though they disagree on what the proper standard is. Continental argues that the proper standard is that adopted by the Third and Seventh Circuits, i.e., that a violation is not willful unless the employer's conduct is knowingly or recklessly in violation of the statute, see Brock v. Richland Shoe Co., 799 F.2d 80, 82-84 (3d Cir.1986), cert. granted, --- U.S. ----, 108 S.Ct. 63, 98 L.Ed.2d 27 (1987); Walton v. United Consumers Club, Inc., 786 F.2d 303, 308-11 (7th Cir.1986), and urges that under this standard we should limit the Secretary's recovery to a two-year period. The Secretary urges us to uphold the finding of willfulness but to do so under the standard adopted by the District of Columbia Circuit in Laffey v. Northwest Airlines, Inc., 567 F.2d 429 (D.C.Cir.1976), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), i.e., that an employer's violation is willful when the employer "is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt." Id. at 462.
 
 
 33
 We are aware that since our decision in Carls Drug, the Supreme Court has ruled that Sec. 7(b) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Sec. 626(b) (1982), which allows an award of liquidated damages only upon a finding of "willful violations" of the ADEA, requires proof of a knowing violation of, or reckless disregard for, the requirements of the ADEA, see Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). And we are informed that the Court has granted the petition for certiorari in Brock v. Richland Shoe Co., in which the Secretary urges the Court to adopt the Laffey standard. Nonetheless, we see no reason in the present case to address the question of whether either the grant of certiorari in Richland Shoe or the ruling already rendered under the ADEA in Thurston has implications for the continuing vitality of Carls Drug, for given the district court's findings of fact, Continental's conduct would be considered willful under any of the three standards.
 
 
 34
 First, focusing on the Thurston standard, we note that the district court in the present case, in rejecting Continental's effort to fend off an award of liquidated damages, found that Continental had not obtained a ruling from the Secretary, or even an opinion from its attorneys, as to whether its pay schedule met the requirements of the Act, and had taken no other steps to determine the lawfulness of its conduct. The court thus found that the Company did not have a good-faith or reasonable basis for believing that its conduct was lawful. In our view, the question of whether or not a defendant had a good-faith or reasonable basis for believing its acts were lawful differs little, if at all, from the question of whether or not its acts were performed with reckless disregard for their legality. In Thurston, the Supreme Court noted that the same concerns inform both questions, see 469 U.S. at 128 n. 22, 105 S.Ct. at 625 n. 22 (while ADEA Sec. 7(b)'s willfulness provision does not incorporate 29 U.S.C. Sec. 260, "the same concerns are reflected" in both), and its inquiry paralleled that of the district court here. Thus, the Thurston Court concluded that the defendant before it had not acted willfully, i.e., with a reckless disregard for the lawfulness of its acts, because the defendant had consulted with its attorneys, met with its employees, and devised a plan specifically for the purpose of complying with the ADEA. Given the contrary findings in this case that Continental adhered to its pay schedule without taking any steps whatever to determine the lawfulness of its conduct and hence had no good-faith or reasonable basis for believing its conduct was lawful, we have little doubt that Continental's conduct would be found willful under the Thurston standard.
 
 
 35
 Nor would application of the Laffey standard rather than the Carls Drug standard affect the result reached here. Each of these standards comprises two tests, one focusing on the employer's state of mind, the other on its actions. The Carls Drug standard imposes on the plaintiff a heavier burden than does Laffey with respect to the employer's state of mind, but a lighter burden than Laffey with respect to the employer's conduct. Thus, the plaintiff must show the employer's actual knowledge of the applicability of the Act under Carls Drug, but need show only its awareness of an appreciable possibility of such applicability under Laffey. As to conduct, the plaintiff must show under Laffey that the employer failed to take steps reasonably calculated to resolve any doubt as to the Act's applicability, whereas under Carls Drug he need show only that the employer's conduct violated the Act.
 
 
 36
 The finding that Continental knew its operations were covered by the Act satisfies the more stringent Carls Drug test with regard to the employer's state of mind. The finding that the Company, knowing it was subject to the Act, failed to comply, failed to seek any opinion from counsel or from the Secretary as to its obligations under the Act, and failed to take any other steps to determine those obligations easily meets the more stringent Laffey test with respect to the employer's actions. Consequently, we conclude that the district court's findings were sufficient to support a conclusion of willfulness under either test.
 
 
 37
 In sum, we conclude that the district court properly ruled that the appropriate period of limitations was three years.
 
 C. Liquidated Damages
 
 38
 Section 216(b) of 29 U.S.C. provides that an employer who violates the minimum-compensation provisions of the Act is liable for the amount of the unpaid minimum wages or overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. Sec. 216(b). Under 29 U.S.C. Sec. 260, however,
 
 
 39
 if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [Act], the court may, in its sound discretion, award no liquidated damages or award any [lesser] amount thereof....
 
 
 40
 The district court awarded the Secretary compensatory damages for the period June 1, 1982, to June 30, 1986, and liquidated damages for the period June 1, 1982, to December 31, 1985, but not for the period January 1, 1986, to June 30, 1986. Continental contends that the court should not have awarded liquidated damages at all because it established its good faith and reasonable grounds for believing its pay schedule did not violate the Act. The Secretary contends that the court should have awarded such damages for the entire period for which compensatory damages were awarded. We agree with the Secretary.
 
 
 41
 Under Sec. 260, the employer bears the burden of establishing the defense of good faith. The defense requires plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it. See Williams v. Tri-County Growers, Inc., 747 F.2d 121, 129 (3d Cir.1984); Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 468-69 (5th Cir.1979). If the defendant presents such proof, the court has discretion to deny or reduce the liquidated damages for all or any part of the relevant time period. The burden is a difficult one to meet, however, and "[d]ouble damages are the norm, single damages the exception...." Walton v. United Consumers Club, Inc., 786 F.2d at 310.
 
 
 42
 Continental does not dispute the findings, discussed above, that it failed to take any steps to determine the legality of its practices, but argues merely that it was entitled to disagree with the Secretary's interpretation of the Act and to adhere to industry practice in deeming its day-shift rate to be the employees' regular rate of pay within the meaning of the Act. Rejection of this argument was appropriate, and we see no basis for overturning the findings that the Company had not acted in good faith and had no reasonable basis for believing that its practices complied with the Act. Consequently, we affirm the court's award of liquidated damages, so far as it went.
 
 
 43
 We also, however, must reverse the judgment insofar as it failed to award liquidated damages for part of the period for which compensatory damages were awarded. The Act does not authorize the court to decline to award liquidated damages, in whole or in part, unless the employer has established its good-faith, reasonable-basis defense. The court awarded $7,222.25 in compensatory damages for the period January 1, 1986, to June 30, 1986, and did not state any reasons for its denial of liquidated damages for this period. Given its findings as to the lack of good faith and of any reasonable basis for Continental's belief in the lawfulness of its conduct, the court was required to award liquidated damages for the entire period.
 
 D. Other Contentions of the Secretary
 
 44
 The Secretary's other contentions in support of his cross-appeal are that the district court was required to enjoin Continental from further violations of the Act, and that the court should have granted the Secretary a restitutionary injunction under 29 U.S.C. Sec. 217 requiring Continental to pay back wages, instead of "merely" a judgment under 29 U.S.C. Sec. 216 ordering it to pay those wages. The Secretary's argument in support of the latter contention is that "the purpose of a restitutionary injunction is ... to compensate employees who have not received their statutory wage and to correct 'a continuing offense against the public interest,' " and that an injunction would be enforceable against the employer itself through use of the court's contempt power, whereas the money judgment may be enforced only through execution on the employer's property. These contentions need not detain us long.
 
 
 45
 The decision whether or not to grant injunctive relief under Sec. 217 lies within the sound discretion of the district court. Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 215, 79 S.Ct. 260, 265, 3 L.Ed.2d 243 (1959). We find no abuse of discretion in the form of the monetary award. The compensatory purpose of the Act generally will be as well served by a judgment for money damages as it will be by a restitutionary injunction in the same amount. The district court concluded that the Secretary had failed to present evidence of facts sufficient to demonstrate need for injunctive relief. In this Court, the Secretary has pointed to nothing in the record to suggest either that the violations by Continental would continue in the absence of injunction or that the Secretary will have any difficulty in collecting the damages awarded. Rather, the record shows substantial cooperation by Continental in the conduct of this lawsuit. It agreed to pay nearly $40,000 to settle a backpay claim on behalf of non-word-processing employees; it stipulated to the amount of overtime compensation due word processor operators under the Secretary's theory; and it spent $10,000 to update and computerize its recordkeeping procedures to facilitate compliance with the Act. These factors, while not foreclosing a grant of injunctive relief, indicate that the denial of such relief, where the Secretary has not persuaded the court of the need for an injunction, is not an abuse of discretion.
 
 
 46
 In light of this conclusion, we need not address Continental's contention that it would have been impermissible to grant relief under both Sec. 216 and Sec. 217 in the same action.
 
 CONCLUSION
 
 47
 The judgment of the district court is reversed to the extent that it failed to award the Secretary $7,222.25 in liquidated damages for the period January 1, 1986, to June 30, 1986, and we remand for entry of a modified judgment including such an award. In all other respects, the judgment is affirmed.
 
 
 48
 Costs to the Secretary on the appeal by Continental; no costs on the cross-appeal.