Alexis M. HERMAN, Secretary of Labor, United States Department of Labor, Plaintiff–Appellee,

v.

RSR SECURITY SERVICES LTD., Michael A. Stern, Individually and as President, and Frank Watkins, Individually and as Vice President, Defendants–Appellees,

Murray Portnoy, Individually and as Chairman of the Board and former Secretary of RSR Security Services, Ltd., Defendant–Third–Party–Plaintiff–Appellant,

v.

Marilyn J. Stern, Third–Party–Defendant–Appellee.

Docket No. 97–6255.

United States Court of Appeals, Second Circuit.

Argued Sept. 3, 1998.

Decided March 19, 1999.

Alan B. Pearl, Syosset, New York (Alan B. Pearl & Associates, P.C., Syosset, New York, of counsel), for Defendant–Third–Party–Plaintiff–Appellant Murray Portnoy.

Paul L. Frieden, Washington, D.C. (U.S. Department of Labor, Washington, D.C., of counsel), for Plaintiff–Appellee Alexis M. Herman.

Bryan C. Skarlatos, New York, New York (Brian C. Wille, William F. Cuozzi, Kostelanetz & Fink, LLP, New York, New York, of counsel), for Defendants–Appellees RSR Security Services Ltd. and Michael A. Stern and Third–Party–Defendant–Appellee Marilyn J. Stern.

Before: NEWMAN, CARDAMONE, and PARKER, Circuit Judges

CARDAMONE, Circuit Judge:

The victor at Waterloo, when asked to undertake a task, reputedly responded: "The Duke of Wellington declines to interfere in circumstances over which he has no control." Appellant here interfered in business affairs where, the record reveals, he had considerable control over employees. Under the Fair Labor Standards Act, such control of employees is central to deciding whether appellant should be deemed an employer and therefore liable to his employees for unpaid wages.

Murray Portnoy (Portnoy or appellant) appeals from a judgment entered on March 31, 1997 in the United States District Court for the Eastern District of New York following a bench trial before Chief Judge Charles P. Sifton. The trial court found appellant, who served as chairman of the Board of RSR Security Services, Ltd. (RSR), was an employer under the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201–19 (1994), and thus was liable for RSR's violations of the FLSA's minimum wage, overtime, and recordkeeping requirements. Portnoy also appeals from an order dated March 17, 1996 from the same court dismissing his third-party complaint against Marilyn J. Stern and his cross-claims against defendants Michael A. Stern and Frank Watkins seeking contribution and/or indemnity from them. The latter appeal raises the issue—one of first

impression in this Court—of whether there is a right to contribution or indemnity under the FLSA.

## BACKGROUND

### A. *Facts*

In late 1987 Michael Stern, Marilyn Stern (Michael's wife), and Murray Portnoy incorporated RSR to provide security guard, pre-employment screening, polygraph, patrol, and undercover services to corporate clients. Portnoy, a principal in the labor relations firm of Portnoy, Messinger & Pearl, became involved in the corporation's formation in late 1987 when Marilyn Stern—the daughter of a deceased friend—asked him for help in locating a job for her husband, Michael. Portnoy responded to this request by providing the financing necessary to start RSR, of which he and Marilyn Stern each owned 50 percent.

This arrangement seemed suitable since Michael Stern had knowledge of the security business from his previous ownership of two other security guard companies. But, because one of his security companies had been investigated by the IRS, resulting in an outstanding judgment against him, Michael Stern was not made a stockholder in the newly formed corporation. In addition, both of Stern's previous security guard companies had been investigated by the Department of Labor for minimum wage and overtime violations of the FLSA. Subsequent violation claims arising from these investigations were resolved without litigation.

The record does not clearly indicate whether Portnoy was aware of Michael Stern's alleged FLSA violations prior to organizing RSR and the institution of the present litigation. In any event, Stern was elected president of RSR, and Portnoy served as chairman of the Board and held various other positions from time to time. Prior to 1988 when Frank Watkins was hired as vice president, Portnoy and Stern were the company's only officers. RSR's main office was located in Long Island City, New York, and its branch office was maintained in the Westbury, New York offices of Portnoy, Messinger & Pearl. The majority of RSR's operations, including those involving the security guards, were conducted at the Long Island City office.

Michael Stern managed the security guard operations. He hired and fired guards, set the rates for their services, assigned them to job locations, monitored their performance, prepared the payroll, and maintained the company's files. In late fall 1988 Stern and Portnoy hired Frank Watkins as a vice president to assist Stern in the daily operation of the business. His duties included overseeing the security guards and the undercover investigators, conducting pre-employment screenings for clients, and maintaining company files. After a year, Watkins also became involved in sales and marketing, preparing the guards' payroll, and assisting Stern in hiring and firing decisions.

### 1. *Portnoy's Participation in RSR*

Although Portnoy exercised broad authority over RSR operations while working out of the Westbury office, he was not directly involved in the daily supervision of the security guards. Inasmuch as he was the only principal who had bank credit, he exercised financial control over the company. Thus, he had authority over Stern and Watkins; in his testimony, he asserted he could have unilaterally dissolved RSR, had Stern not followed his instructions. Portnoy's financial activities included the signing of RSR loans, approving purchases, and leasing vehicles for RSR employees on his personal credit. Watkins also testified that a raise he received came from Portnoy.

In addition, Portnoy frequently gave Stern and Watkins instructions on conducting RSR business. On one occasion, for example, he became aware, through RSR's accountant, that security guard employees were being illegally included as

independent contractors on IRS 1099 forms. Subsequently, Portnoy instructed Stern and Watkins to cease the practice and later checked with other employees of the company to ensure the practice had been terminated.

Portnoy kept himself apprised of RSR operations by receiving periodic reports from employees in the Long Island City office. Watkins sent him faxes, work orders, memos, investigation reports, and invoices concerning the business operations, as well as weekly timesheets of his duties. Brian Serotta, an RSR accountant, reported to Portnoy with respect to company finances and, on at least one occasion, informed him about improprieties regarding the compensation of security guards. Appellant also requested that Bonni McGuirk, an RSR salesperson, be his "eyes and ears" in the company. Following this request, McGuirk gave him verbal briefings and sent him copies of letters and work orders. Another former RSR salesperson, Karen Goodman, testified she forwarded client complaints to Portnoy. Further, appellant telephoned the Sterns "reasonably frequently." Portnoy also participated in hiring and recruiting some RSR employees. He hired Bonni McGuirk to market security guard services and assisted in the hiring of Karen Goodman.

Portnoy took part more directly in the security guard operations. He referred a few individuals to RSR as potential security guard employees. He assigned guards to cover specific clients, sometimes set the rates clients were charged for those services, gave Watkins instructions about guard operations, and forwarded complaints about guards to Watkins. He also directed Watkins to show RSR's employment application forms to Alan Pearl of Portnoy, Messinger & Pearl for revisions.

Moreover, Portnoy was involved in some aspects of the compensation of the guards. For instance, he signed payroll checks on at least three occasions when, due to illness, Stern was unable to do so. Further, Portnoy established a payment system by which clients who wanted undercover operatives would pay Portnoy, Messinger & Pearl, which then forwarded the payments to RSR. In addition, John Thompson testified that Portnoy resolved a complaint about a work-related problem regarding Thompson's son, whom RSR employed as a security guard.

Because of his participation in company business, Portnoy was viewed by others as having control over RSR operations. Employees, including Watkins and several security guards, testified they viewed him as the "boss" of RSR. Portnoy did not discourage this view and in fact represented himself to outside parties as having such authority by allowing his name to be used in sales literature, by representing to potential clients that he was a principal with control over company operations—one who demanded nothing less than the highest legal, ethical, and quality services from the company—by using his reputation with Portnoy, Messinger & Pearl clients to obtain and refer clients to RSR, and by giving Watkins instructions with respect to those clients' security needs.

### 2. Portnoy's Knowledge of the FLSA

Describing the FLSA as his "passion," Portnoy testified that he had extensive knowledge of the FLSA and its requirements during the dates in question. He first became familiar with this law in 1939 and has kept up with it ever since, often advising clients of Portnoy, Messinger & Pearl how to comply with FLSA provisions. An investigator for the Department of Labor confirmed these statements when she testified that she had dealt with Portnoy for the past ten to 15 years because of his expertise regarding the FLSA. She stated that one of the specific areas of Portnoy's expertise was determining when and whether employees were entitled to overtime compensation.

### 3. The FLSA Violations

RSR employees were paid hourly wages starting at the minimum wage. RSR de-

138

ducted from a guard's first or second paycheck a $40 or $45 fingerprint processing fee. The fingerprinting was required under state law, and the deductions were recorded on the payroll records as "state fees." Payroll records reflect that during the weeks these deductions were made, the guards received less than the minimum wage—a clear violation of the FLSA. *See* 29 U.S.C. §§ 206, 215(a)(2) (1994).

In addition, RSR security guards frequently worked over 40 hours, with some employees logging an average of 70 to 80 hours per week. The actual hours worked were recorded on timesheets and logbooks. However, Stern or Watkins recorded different numbers on payroll records, in order to reflect one-third less overtime worked per week than each guard actually had worked. Thus, although RSR's payroll records indicated that RSR was compensating guards for overtime at one and one-half times their regular pay, RSR was in fact paying its employees the same rate for all hours worked, including overtime, and deliberately concealing this practice by falsifying its payroll records. These practices also violated the FLSA. *See* 29 U.S.C. §§ 207, 211(c), 215(a)(2), 215(a)(5) (1994).

## B. *Prior Proceedings*

This conduct came to light in 1993 when the Department of Labor began investigating RSR. On December 7, 1993 the Secretary of Labor (Secretary) filed a complaint charging defendants RSR, Michael Stern, and Frank Watkins with willfully violating the minimum wage, overtime, and record-keeping requirements of the FLSA from January 1991 through March 1994. The Secretary sought back wages and liquidated damages on behalf of RSR's employees, as well as a permanent injunction preventing defendants from committing future violations of the FLSA. *See* 29 U.S.C. §§ 216(c), 217 (1994). Later, the Secretary amended her complaint to add Portnoy as a defendant, claiming that he was an employer under the FLSA. Appellant

answered the complaint and amended his answer on June 26, 1995 to assert cross-claims for indemnity and contribution against Watkins and against both Michael and Marilyn Stern.

Both the Secretary and Portnoy moved for summary judgment on the issue of whether Portnoy was an employer under the FLSA, and the district court denied the motions in an order dated March 17, 1996. In that same order, the court granted the application to dismiss the Secretary's claim against Watkins. That order also dismissed Portnoy's cross-claims against Michael Stern and Watkins, as well as Portnoy's third-party complaint against Marilyn Stern.

A bench trial was held the last week of September 1996 on the remaining issues. Because on September 24 defendants RSR and Stern consented to the entry of a default judgment and stipulated to the amounts they owed the government, the only defendant contesting liability at the bench trial was Portnoy.

Six months later by order dated March 31, 1997 the district court ruled that Portnoy was an employer under the FLSA, that he had willfully violated the FLSA, and ordered him to pay $78,878.02 in back wages. Appellant was, in addition, found liable for liquidated damages in the same amount because of his failure to show good faith and objectively reasonable grounds for his asserted belief that RSR had been acting in conformity with the FLSA. Judgment was entered against appellant for $157,756.04.

Portnoy brought post-trial motions pursuant to Federal Rules of Civil Procedure 52(b) and 59(a), seeking amended or new findings of fact, a new trial, and an order directing entry of judgment in his favor. In an order dated August 12, 1997 the district court denied all the post-trial motions, ruling that nothing had been raised that warranted changing the factual findings or legal conclusions of the March 31, 1997 order. Portnoy appeals from the

March 31, 1997 and August 12, 1997 orders and from the interlocutory order of March 17, 1996. We affirm.

## DISCUSSION

### I Standard of Review

■ On appeal from a bench trial, the district court's underlying findings of fact are reviewed for clear error, and its ultimate conclusions of law are reviewed *de novo*. *See Lopresti v. Terwilliger*, 126 F.3d 34, 38–39 (2d Cir.1997) (citing Fed. R.Civ.P. 52(a)); *see also Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir.1995) (reviewing the willfulness of an FLSA violation as a mixed question of law and fact under this standard); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) (same for employee status under the FLSA); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983) (same for employer status under the FLSA).

### II Qualifying as an "Employer" Under the FLSA

#### A. *Statutory Definitions*

■ To be held liable under the FLSA, a person must be an "employer," which § 3(d) of the statute defines broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (1994). The Supreme Court has emphasized the "expansiveness" of the FLSA's definition of employer. *Falk v. Brennan*, 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973). Above and beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have "the widest possible impact in the national economy." *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir.1984).

#### B. *Economic Realities*

■ Because the statute defines employer in such broad terms, it offers little guidance on whether a given individual is or is not an employer. In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question, *see Carter*, 735 F.2d at 12, with an eye to the "economic reality" presented by the facts of each case, *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961). Under the "economic reality" test, the relevant factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12 (quoting *Bonnette*, 704 F.2d at 1470).

■ No one of the four factors standing alone is dispositive. *See Superior Care*, 840 F.2d at 1059. Instead, the "economic reality" test encompasses the totality of circumstances, no one of which is exclusive. Since economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (whether an employer-employee relationship exists does not depend on isolated factors but rather "upon the circumstances of the whole activity").

■ Yet, such status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control "do[ ] not diminish the significance of its existence." *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir.1982); *see Superior Care*, 840 F.2d at 1060; *Carter*, 735 F.2d at 12–13.

## C. *Application*

■ Using this "economic reality" test, we must decide whether Portnoy is an employer under the FLSA. Evidence in the record supports at least three of the four factors. First, appellant had the authority to hire employees as evidenced by his hiring of Stern, Watkins, Brian Serotta, and Bonni McGuirk. Although this hiring involved mainly managerial staff, the fact that he hired individuals who were in charge of the guards is a strong indication of control. *See Donovan v. Grim Hotel Co.,* 747 F.2d 966, 972 (5th Cir.1984) (noting as important evidence that defendant "personally selected the manager of every hotel").

Second, the proof suggests that Portnoy, on occasion, supervised and controlled employee work schedules and the conditions of employment. For example, he was involved in the assignment of guards to some work locations and, in addition, instructed Watkins to have Alan Pearl of Portnoy, Messinger & Pearl review and revise RSR's employment application forms.

■ The third factor asks whether the alleged employer determined the rates and method of payment to employees. Little evidence suggests Portnoy was involved with determining the rate of payment to the security guard employees. But he did participate in the method of payment when he ordered a stop to the illegal pay practice of including security guards on 1099 forms as independent contractors. The record further reflects that appellant signed security guard payroll checks on at least three occasions. Appellant contends that such cannot be the basis for liability because two of those three occasions occurred before the period giving rise to liability, but this contention is not a relevant consideration in determining his status as an employer. The key question is whether Portnoy had the authority to sign paychecks throughout the relevant period, and he did.

Fourth, there is no evidence that Portnoy was involved in maintaining employment records. But that this fourth factor is not met is not dispositive. *See Superior Care,* 840 F.2d at 1059.

In determining that Portnoy was an employer, the trial court also looked at several additional circumstances evidencing his control over RSR employees. Particularly in point was the exercise of authority over both Stern and Watkins, as demonstrated by the frequency with which he gave them instructions on running RSR. Because he controlled the company financially, it was no idle threat when he testified that he could have dissolved the company if Stern had not followed his directions.

## D. *Resolving Portnoy's Contentions*

■ In challenging the trial court's conclusion that he was an employer for FLSA purposes, appellant raises a number of arguments, several of which require comment. Portnoy contends that evidence showing his authority over management, supervision, and oversight of RSR's affairs in general is irrelevant, and that only evidence indicating his direct control over the guards should be considered. Such a contention ignores the relevance of the totality of the circumstances in determining Portnoy's operational control of RSR's employment of the guards. In addition, other circuits have held that operational control is relevant in determining whether an individual is an employer under the FLSA. *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991) (employer includes person who has "operational control" of day-to-day functions); *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983) (employer includes person who has "operational control"); *Donovan v. Sabine Irrigation Co.,* 695 F.2d 190, 194–95 (5th Cir. 1983) (employer includes person who "effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees").

Appellant also insists the district court's decision conflicts with holdings from other courts of appeals. But the cases he cites to support this proposition are readily distinguished. In *Wirtz v. Pure Ice Co.,* 322 F.2d 259, 262–63 (8th Cir.1963), stock ownership, in and of itself, was held insufficient to give rise to employer status. And in *Sabine,* 695 F.2d at 195, the court held that stock ownership is not necessary to a finding of employer status. Portnoy was, of course, not only a 50 percent stockowner; he had direct involvement with the security guard operations from time to time and was generally involved with all of RSR's operations.

▮ Moreover, appellant declares that some evidence should be disregarded because the Department of Labor encouraged Watkins and others to testify falsely, for instance, by dismissing Watkins as a defendant in exchange for his allegedly false testimony against Portnoy. However, Portnoy offers no proof that Watkins' testimony was false, or that this *quid pro quo* ever existed. Other arguments raised in a similar vein, *e.g.,* Portnoy's entitlement to notes from a meeting between Watkins and the Department and, to have his lawyer present at the meeting, accusations that two witnesses testified falsely because they would personally benefit from a verdict against Portnoy, were just that—conclusory arguments, with no support in legal theory and, therefore, without merit.

Finally, appellant urges that some of the factual findings upon which the trial court's decision is based are clearly erroneous. Because, as documented above, persuasive evidence in the record supports the trial court's factual findings, we see no reason to hold those findings clearly erroneous. In light of the totality of all the circumstances and proof before the district court, its factual findings and legal conclusion that Portnoy qualifies as an employer under the economic realities test must be affirmed.

## III The Statute of Limitations and Willful Violations of the FLSA

▮ The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions, but allows a three-year limitations period for "a cause of action arising out of a willful violation." 29 U.S.C. § 255(a) (1994). Thus, in this case, if Portnoy is found to have willfully violated the FLSA, he will be liable for the pay violations of the past three years, instead of just the past two years.

▮ The district court found that Portnoy willfully violated the FLSA. Appellant asserts this finding is erroneous. The accepted standard for determining willful behavior, for which plaintiff bears the burden of proof, was enunciated by the Supreme Court in *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

Conflicting testimony was presented as to Portnoy's actual knowledge of the FLSA violations. Watkins testified he told Portnoy that the guards were being cheated. Witness Amatulli, a security guard, also testified he told Portnoy he was not being paid time and a half for his overtime hours. On appeal, Portnoy denies these conversations occurred and maintains that Watkins and Amatulli testified falsely. As the district court correctly determined, however, it is unnecessary to decide whether the conversations actually occurred, because the "reckless disregard" prong was satisfied even discounting this evidence.

The trial court reasoned that although Portnoy may not have had actual knowledge of the violative practices, the proof demonstrated he recklessly disregarded the possibility that RSR was violating the FLSA. Several reasons support this conclusion. First, when he agreed to form RSR, the trial court found, Portnoy was

aware that one of Stern's previous security guard companies had been the subject of an Internal Revenue Service investigation, which led to the filing of an outstanding judgment against Stern. Hence, Portnoy knew Stern had conducted his earlier business activities in an illegal manner. With this background, when appellant subsequently learned that RSR guards were illegally included on 1099 forms as independent contractors—an indication of unlawful activity—he made no effort to ascertain RSR's compliance with the FLSA.

In response, appellant avers he had no independent knowledge that security guards were not being paid overtime, or even that the security guards were being paid minimum wages and therefore subject to the requirements of the FLSA. And, Portnoy further states, he repeatedly checked with Michael Stern, Marilyn Stern, and Watkins in order to ensure that RSR was complying with the law. But, for Portnoy to rely on information from Stern and Watkins in this context was reckless because Portnoy already knew of Stern's prior illegal activities and that some of RSR's own pay practices, which had come to his attention, violated the law. Moreover, appellant had independent means of determining the rates at which guards were paid since he was in regular contact with various RSR employees, including RSR's accountant; he could easily have inquired into the pay rates for the security guards. Portnoy was, after all, an expert in this field who had extensive knowledge of the FLSA and its requirements.

Under the circumstances, the district court was correct to rule that for Portnoy to rely upon the promises of Stern and Watkins was a reckless disregard of the risk that RSR was not in compliance with the FLSA. Such reckless disregard constituted a willful violation of the statute.

## IV Liquidated Damages

■ The FLSA states that an employer who violates the Act's minimum wage or overtime provisions "shall be liable to the

... employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (1994). Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA. *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583–84, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942).

■ Courts have discretion to deny an award of liquidated damages where the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective "good faith" and had objectively "reasonable grounds" for believing that the acts or omissions giving rise to the failure did not violate the FLSA. 29 U.S.C. § 260 (1994). The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception. *See Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 71 (2d Cir.1997). To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them. *See id.*

■ Portnoy failed to prove good faith. The scenario in this case is somewhat different from the ordinary one because Portnoy had extensive knowledge of the FLSA's requirements, but utterly failed to take the steps necessary to ensure RSR's pay practices complied with the Act. Many of the cases in this area of the law address situations where the employer has knowledge of his pay practices but is ignorant of the requirements of the FLSA. *See, e.g., Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir.1987). Nor did appellant, for reasons already discussed, demonstrate objectively reasonable grounds for believing that RSR

was in compliance with the FLSA.[1] Because appellant failed to prove both subjective good faith and objective reasonableness, liquidated damages were properly assessed against him.

## V The FLSA and the Right to Contribution

Finally, we turn to the question of whether there is a right to contribution or indemnification under the FLSA. This issue, as noted earlier, is one of first impression in this Court. Following the methodology of *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), the district court concluded there was no right to such relief under the FLSA and therefore dismissed Portnoy's claim asserting such rights against both of the Sterns and Watkins.

In *Northwest* the issue of contribution arose after Northwest Airlines was found liable for paying female flight attendants less than similarly positioned male flight attendants in violation of Title VII and the Equal Pay Act. *See* 451 U.S. at 81, 101 S.Ct. 1571. Northwest Airlines sought contribution from the flight attendants' union that had negotiated the unequal pay rates for its members. *See id.* at 82, 101 S.Ct. 1571. To determine whether either statute provided for a right of contribution, the Supreme Court focused its inquiry on traditional tools of statutory interpretation, looking at the language of the statute, examining its purpose and structure, and reviewing its legislative history.

The Court held that neither the Equal Pay Act nor Title VII by its express terms created a right of contribution in favor of employers. *See id.* at 91, 101 S.Ct. 1571. Despite this omission such a right may still exist if the statute was "enacted for the special benefit of a class of which petitioner is a member." *Id.* at 92, 101 S.Ct. 1571.

But, the Court concluded, the purpose of both statutes was to benefit employees, and employers were not members of the class for whose special benefit either statute was enacted. *See id.* It further observed that the comprehensive nature of the remedial schemes in both statutes strongly evidenced a congressional purpose not to authorize additional remedies. *See id.* at 93–94, 101 S.Ct. 1571. Moreover, the legislative history of each statute was silent on the issue of contribution. *See id.* at 94, 101 S.Ct. 1571. In light of this analysis, the Supreme Court held that there was no right to contribution under either Title VII or the Equal Pay Act. *See id.* at 95, 101 S.Ct. 1571.

Portnoy maintains that the present action may be distinguished from *Northwest* because his claims of contribution and indemnification against co-employers comport with the purpose and policy of the FLSA, more than Northwest Airline's claim for contribution against an employee union comported with the purpose and policy of either Title VII or the Equal Pay Act. To the contrary, in *Northwest*, the Supreme Court assumed for the purposes of its analysis that the union bore "significant responsibility for discriminatory practices that these statutes were designed to prohibit," and that all the elements of contribution were met. 451 U.S. at 88, 90, 101 S.Ct. 1571. And, even assuming that the union was as culpable as a co-employer, the Court ruled that "[n]one of these assumptions ... provides a sufficient basis for recognizing the right" to contribution absent statutory authority. *Id.* at 90, 101 S.Ct. 1571. As the district court correctly held, Portnoy's status as an employer places him outside of the statute's intended protection, regardless of the status of the party from whom he seeks contribution.

Applying the *Northwest* analysis to the FLSA leads us to the same conclusion:

1. The district court mistakenly said "[Portnoy] was well aware that other RSR practices had violated the FLSA." However, from the rest of the court's discussion, we believe it clear that the district court meant to comment on Portnoy's knowledge of RSR's illegal practice concerning the 1099 forms.

There is no right of contribution or indemnification for employers found liable under the FLSA. The reasons are readily apparent. First, the text of the FLSA makes no provision for contribution or indemnification. Second, the statute was designed to regulate the conduct of employers for the benefit of employees, and it cannot therefore be said that employers are members of the class for whose benefit the FLSA was enacted.

Third, the FLSA has a comprehensive remedial scheme as shown by the "express provision for private enforcement in certain carefully defined circumstances." *Northwest,* 451 U.S. at 93, 101 S.Ct. 1571. Such a comprehensive statute strongly counsels against judicially engrafting additional remedies. Fourth, the Act's legislative history is silent on a right to contribution or indemnification. *See Joint Hearings on H.R. 7200 and S. 2475 Before the Senate Comm. on Educ. and Labor and the House Comm. on Labor,* 75th Cong. (1937), *reprinted in* 4 American Landmark Legislation: The Fair Labor Act of 1938, at 37–116 (Irving J. Sloan ed., 2d series, 1984) [hereinafter American Landmark Legislation]; S.Rep. No. 75–884 (1937), *reprinted in* American Landmark Legislation at 117–24; H.R.Rep. No. 75–1452 (1937); H.R.Rep. No. 75–2182 (1938); 83 Cong. Rec. 6894–6895, 7274–7326, 7373–7451, 7648–7673, 7720–7751, 7770, 7778–7813, 7863–7900, 7918–7957, 9158–9180, 9246–9267, 9615–9616 (1937–38), *reprinted in part in* American Landmark Legislation at 125–470. Accordingly, we hold that there is no right to contribution or indemnification for employers held liable under the FLSA.

Cases from other circuits support this conclusion. Several have followed *Northwest*'s reasoning in similar situations. *See Martin v. Gingerbread House, Inc.,* 977 F.2d 1405, 1408 (10th Cir.1992) ("a third party complaint by an employer seeking indemnity from an employee is preempted" by the FLSA); *Lyle v. Food Lion, Inc.,* 954 F.2d 984, 987 (4th Cir.1992) (court should not "engraft an indemnity action upon this otherwise comprehensive federal statute," *i.e.,* the FLSA); *Le-Compte v. Chrysler Credit Corp.,* 780 F.2d 1260, 1264 (5th Cir.1986) (same).

■ Yet, even if the FLSA does not authorize contribution or indemnification, appellant declares these claims may nonetheless be prosecuted under New York law. This view of the law is flawed because the FLSA's remedial scheme is sufficiently comprehensive as to preempt state law in this respect. In addition, federal courts recognize a right to contribution under state law only "in cases in which state law supplie[s] the appropriate rule of decision." *Northwest,* 451 U.S. at 97 n. 38, 101 S.Ct. 1571. Here, federal law, not state law, supplies the appropriate rule of decision because the instant claim has been brought solely pursuant to the FLSA.

## CONCLUSION

As a consequence, and for the foregoing reasons, we affirm the judgment and order of the district court.